Nos. 105,918
105,919

STATE OF KANSAS, *Appellee*, v. WILLIE JEROME SMITH-PARKER,
*Appellant*.
(340 P.3d 485)

Opinion filed December 24, 2014.

*Samuel D. Schirer*, of Kansas Appellate Defender Office, argued the cause, and *Lydia Krebs*, of the same office, was on the brief for appellant.

*Christina Trocheck*, assistant district attorney, argued the cause, and *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This is defendant Willie Smith-Parker's direct appeal from two prosecutions joined for a single jury trial. The first case arose from a burglary/homicide on the morning of June 13, 2009, and the second arose from a fatal shooting on the morning of June 19, 2009. Smith-Parker was convicted of first-degree premeditated murder in the death of Alfred Mack, second-degree intentional murder in the later death of Justin Letourneau, theft, and aggravated assault. The jury acquitted Smith-Parker of two aggravated burglary counts.

Smith-Parker raises 10 issues in this appeal: (1) whether the evidence of premeditation of Mack's murder was sufficient; (2) whether aiding and abetting is an alternative means crime; (3) whether the two cases should have been consolidated for trial; (4) whether the district judge abused his discretion by excluding a statement made by Letourneau; (5) whether the mandatory wording of an instruction requires reversal for clear error; (6) whether the district judge erred by failing to tell jurors to begin their deliberations anew when an alternate juror was substituted; (7) cumulative error; (8) whether the district judge abused his discretion by refusing to recall the jury; (9) whether the district judge violated Smith-Parker's rights under the Sixth and Fourteenth Amendments to the United States Constitution, as articulated in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), by sentencing him to a harsher penalty based on his criminal history; and (10) whether the district judge violated Smith-Parker's Sixth and Fourteenth Amendment rights, as articulated in *Apprendi*, by sentencing Smith-Parker to the highest sentence in the range in the applicable Kansas Sentencing Guidelines Act presumptive grid box.

We conclude that four of Smith-Parker's allegations of error have merit and that they cumulatively require reversal of all of his convictions, and we remand the case for further proceedings.

Given this result, we need not reach either of his two sentencing issues; but we observe in passing that each has been finally resolved against him in our Kansas courts. See *State v. Ivory*, 273 Kan. 44, Syl., 41 P.3d 781 (2002) (reliance on criminal history permissible); *State v. Johnson*, 286 Kan. 824, Syl. ¶ ¶ 5-6, 190 P.3d 207 (2008) (highest sentence in grid box permissible).

## Factual and Procedural Background

Smith-Parker's numerous appellate issues, including sufficiency of evidence to support his conviction for premeditated first-degree murder, require a recitation of factual and procedural background more lengthy and comprehensive than the norm.

### *Mack Death*

In June 2009, Benjamin Friedman and his roommate lived in Apartment B at 1012 Johnstown Avenue. On the morning of June 13, Friedman's alarm woke him, and he heard someone running down the stairs outside of his apartment. He also heard a loud noise, which he would later describe as similar to a car backfiring. Two other residents of nearby apartments also reported having heard a loud noise at about the same time, describing it as a "great big bang" or a gunshot.

After Friedman got out of bed, he went into the living room of his apartment and noticed that his television was missing. A Sony PlayStation and various movies and video games also were missing.

Friedman went outside and observed that one of the screens to a lower apartment had been removed. Friedman went back into the building and checked the downstairs apartments. He noticed splintering on the door of Apartment C. Friedman could hear a television inside the apartment, but nobody answered the door when he knocked on it.

Friedman then called 911.

When Officer Glen Soldan arrived at the apartments, he observed that the door to Apartment C "had been kicked open and it wasn't quite shut." When he knocked on the door it swung open, and Soldan could see "a large black male lying on his back, feet

towards [the door], obviously not breathing." The man was later identified as Mack.

Soldan entered the apartment to make sure that no one else was in it, and he noticed an empty .22 casing lying on the floor.

When investigators arrived, they found and photographed a partial footprint on a split-rail fencepost just below the deck to Friedman's apartment. Later enhancement of the image would show that the word "Servus" was imprinted on the sole.

Ron Styles, an investigator, would later testify that it appeared Mack had been sitting in a chair watching television and, based on the angle the bullet entered his body, was in the process of standing up when he was shot. The blood splatter pattern in the apartment indicated that Mack probably lived 1 to 2 minutes before collapsing into the kitchen. According to Styles, it was likely Mack was shot from the doorway of the apartment.

Dr. Altaf Hossain conducted Mack's autopsy, which determined that the cause of death was bleeding from a penetrating gunshot wound to the chest. Based on the location of the gunshot wound and information provided by law enforcement, Hossain would testify at trial that Mack had been shot from more than 2 feet away.

Investigators did not have any immediate leads or suspects.

*Letourneau's Death*

A little after 6 on the morning of June 19, 2009, Darci Davis was standing outside the Salina Regional Health Center when she noticed a white four-door car "coming down the street towards the hospital from the right and it squealed into the parking lot across the street . . . and then it squealed around and . . . stopped right beside" her. The driver of the car, later identified as Smith-Parker, asked Davis for directions to the emergency room. Davis noticed that the car's passenger, later identified as Letourneau, was leaning on the driver and had blood on him and that "there was blood on the window, . . . blood on the door, [and] just . . . a lot of blood." Davis provided directions, and Smith-Parker drove off in the direction of the emergency room.

The first nurse to respond found Letourneau in the passenger seat of the car. His airway was "pretty much closed"; he was not

responsive; he had vomit all over him; and appeared to have a head trauma. Another nurse would later testify that there was a "penetration wound to [the victim's] right temple and there was blood and emesis on the patient and in the car and on us." One of the nurses asked Smith-Parker who had shot the passenger. Smith-Parker replied: "I don't know."

A 911 call was placed from the emergency room of the hospital at 6:23 that morning to report a shooting victim.

Crystal Gile was the first law enforcement officer to arrive at the hospital. She found a white Chevy Cavalier parked under the awning of the emergency room. She pulled Smith-Parker aside, and she would testify at trial that Smith-Parker was very emotional during their conversation.

Smith-Parker identified Letourneau, and Gile asked, "What happened to Justin?" Smith-Parker responded, "I killed him." Gile then asked Smith-Parker to explain what had happened. After initially saying that Letourneau had been "beatin' his son momma," Smith-Parker said, "Justin told me he was gonna kill me." Smith-Parker then said that this had happened "on the road." After mentioning a gun, Gile asked Smith-Parker if there was a gun in the car. Smith-Parker did not know where the gun was. Gile then took Smith-Parker into custody and transported him to the Salina Police Department.

Investigators determined that the Cavalier Smith-Parker had driven to the hospital was registered to Tiffany Wellman and Victor Gonzales, and they obtained a search warrant for Wellman's home. During the search, officers found a shoebox on the top shelf of a hallway closet. In it was a cloth, zippered gun case, and inside it was a box of Winchester .38 Special ammunition, some loose Super X .22 shells, and a sock that had more shells inside of it. Investigators also found several DVDs and a backpack, which contained a PlayStation and video cords. A check of the serial number from the PlayStation revealed that it had been reported stolen from Friedman's apartment.

Clayton Hardaway was dispatched to do a welfare check at Letourneau's home. Letourneau's stepbrother, Travis Graham, was inside and Kendra Yanik-Ducharme was outside; a baby was sleep-

ing on the floor. Yanik-Ducharme told Hardaway that Letourneau was her boyfriend. Hardaway asked Yanik-Ducharme when she had last seen Letourneau, and Yanik-Ducharme said she had not seen him since the previous evening. Hardaway informed Yanik-Ducharme that Letourneau had been shot.

While investigators were at Letourneau's, Yanik-Ducharme consented to a search of her car. On the floor of the passenger side of the car, investigators found a gun, which Yanik-Ducharme identified as belonging to Letourneau. The gun was a .38 Colt Cobra pistol.

Letourneau was flown to a Wichita hospital, where the decision was made on June 20 to remove him from life support.

Investigators impounded the Cavalier and searched it. They found a white cotton glove with a Dillon's sack inside it under the driver's seat. Inside the sack was .38 ammunition. A Super X .22 cartridge case was found on the right front floor.

The gun used to shoot Letourneau was never recovered.

Dr. Ronald F. Distefano performed Letourneau's autopsy. Distefano concluded that Letourneau had a single gunshot wound on the right side of his head. Distefano later testified at trial that, based on "stippling" of the skin around the wound, the gun was "a few inches up to possibly a foot" from Letourneau when fired. The direction of the bullet "was from right to left, somewhat from front to back, and slightly downward." At trial, Distefano also testified that, in his opinion, the death was a homicide and not a suicide or accident. But he admitted that he could not make this determination from looking at the body alone. The "findings of the wound show[ed] closeness[, but] they do not show whether [Letourneau] shot himself or whether someone else did." Distefano relied on information provided by the police in reaching his conclusion that the death was a homicide. According to Distefano, based on the information he had received, everything pointed toward homicide and nothing suggested suicide.

Ballistics testing conducted on the .22 casing recovered from Mack's apartment and the Super X .22 casing recovered from the floor of the Cavalier had been ejected from the same gun.

On June 23, 2009, the State filed a Complaint/Information in case No. 09 CR 633, charging Smith-Parker with three counts: aggravated assault of Letourneau, second-degree intentional murder of Letourneau, and criminal possession of a firearm.

Approximately 4 months later, the State filed a Complaint/Information in case No. 09 CR 1047, charging Smith-Parker with five counts: first-degree premeditated murder and first-degree felony murder in the death of Mack, two counts of aggravated burglary of Mack's and Friedman's apartments, and one count of theft of items from Friedman's apartment.

*Pretrial Motions*

The State requested the two cases be tried together, and the district judge initially set the two cases for a joint trial. Smith-Parker then filed a motion to sever. At a hearing on the motion, the district judge concluded that the two cases could not be tried together, noting that the only evidence tying the crimes together was the ballistics testing on the .22 casings.

When the State filed a motion to reconsider the severance, the district judge reversed his previous ruling and allowed the cases to be consolidated. He stated:

"The court is struck by the fact that all of the individuals in both of these cases are well acquainted to each other, their activities, their behaviors, their families, their homes, their connections, their history of sharing experiences together, including the serving of time together, are so inextricabl[y] tied to each other the testimony, quite frankly, is clear that these individuals considered themselves to be brothers, not just friends. They were so close to each other that they viewed each other as relatives, not as just simply acquaintances or people who might have grown to know each other over some period of time.

"They shared common concerns about family members, about children, about actions toward family members, particularly the wife or significant other of Mr. Letourneau concerns raised by Mr. [Smith-Parker], they had their disagreements, they had the common theme of being involved apparently in the allegations and concerns being raised on activity involving residential burglaries and thefts, they had the commonality of the issues of perhaps drug involvements in these matters.

"[B]ut when you look at the totality of the information that has been presented by the State, recognizing that [its] burden remains beyond a reasonable doubt to tie this together and present it coherently to a jury, which is a different standard,

this court is faced with the reality that we do have the connection in these matters, are they same or similar in character.

"We have a death of two individuals, we have burglaries, we have common communication between the parties in this matter discussing that particular activity, discussing the concerns about the character or the person of Mr. Mack discussing Mr. Letourneau, the same act or transaction it is difficult for the court to separate this particular scenario into any one particular act or transaction when you look at this in the sequence of events as presented by investigation, it flows, it flows from one party to another party to the same event to the same house, to the same persons, to the same activities, in that extent it does have the same feel of the same act or transaction.

"Are there two or more acts or transactions that are connected together? When search warrants are executed and suddenly we find stolen property in the residence of someone who is closely related to the individuals charged in this matter. We find that a weapon is located in the same location. We find again that the ballistic matches to the death of both parties.

"There seems to be no significant interruption in the behavior and actions on the part of these individuals throughout these transactions which lead to the death of both individuals and the timeline is so close together within a week we have two individuals who have died as a result of fatal gunshots. Looking at all these cases as set forth and the State's argument that they would be subjected to double jeopardy and the issue of compulsory joinder and the issue of 60-455, quite frankly, and if the State were to present these in two separate proceedings, quite frankly, it may be impossible if not impractical for them to proceed in both cases."

In a journal entry summarizing the hearing, the district judge stated:

"After hearing arguments of counsel, the Court finds that pursuant to K.S.A. 22-3203, the above-captioned cases should be tried together. The Court finds that alleged in offenses in each case are the same general character, require the same mode of trial and the same kind of evidence, and occurred in the same jurisdiction within a short period of time. The Court further finds that the above-captioned cases involve offenses that are the same or similar character or part of a common scheme or plan."

*Voir Dire*

During voir dire, the district judge asked members of the venire if anyone had any hardships that needed to be discussed with the court in chambers. At this point, juror N.B. said, "It's not a hardship[. I]t's just English is not my first language."

While in chambers, N.B. disclosed that he was a librarian at the Salina Public Library and that he had a master's degree in library science from Emporia State University. When asked about his language skills N.B. stated, "I have no problem with communicating with people." But he said he sometimes had trouble following what was being said on television shows, such as CSI. N.B. said he might have to ask people to repeat what had been said, and he reiterated that he did "know the language[;] I read books."

After further discussion, the district judge stated that N.B. was qualified to serve on Smith-Parker's jury. Before N.B. left chambers, the district judge asked N.B. if he would have any problems inquiring if something was said by the court or a witness that he may have misunderstood. N.B. replied that he did not have any problem asking other people if he did not understand something.

*Trial*

At trial, Friedman testified that he knew Graham, Smith-Parker's stepbrother that officers had found sleeping on the couch at Yanik-Ducharme's home the morning of Letourneau's shooting. According to Friedman, Graham had been in his apartment on multiple occasions.

Roommates Nathanial Johnson and Donyell Smith lived in the apartment below Friedman's. Both Johnson and Smith testified that they had seen Thomas Jenkins, a friend of both Smith-Parker and Letourneau, at the apartment complex on the morning of the Johnstown apartments crimes.

Johnson testified that he had seen a person he thought was Thomas on the sidewalk outside of the apartment complex. Johnson knew Thomas because the two had gone to school together. Johnson called out to Thomas and briefly spoke to him. Johnson then went outside to speak with him. After the conversation, Thomas walked away toward the complex' carport.

Smith testified that she saw Thomas as she was going downstairs to the apartment she shared with Johnson. Smith also knew Thomas from school; she said "hi" to him and then continued to the apartment and went to bed. Smith testified that she saw two men

with Thomas, one white and one black. Letourneau was white, and Smith-Parker is black.

Kendra Jenkins, Thomas' wife, testified that she came home at approximately 2 a.m. on the night of the Johnstown apartment crimes. She said Thomas was the only one at her home when she arrived, even though she had earlier told investigators that she saw Smith-Parker and Letourneau with Thomas that night. Kendra also testified that she left her home again that night when her son's father picked her up to retrieve her car. She did not return home until approximately 6:30 a.m. Both Thomas and Smith-Parker were at the home when she returned.

Kendra also testified that Thomas took her somewhere in the country east of Salina a couple of days after the Johnstown apartment burglaries. Thomas had taken a pair of rubber boots with him and he burned them. When Kendra was shown a photograph of a particular brand of boots, she identified the boots as the type Thomas had burned. The brand name of the boots was "Servus."

Wellman testified at trial that Smith-Parker was staying at her home in June 2009. Approximately 1 week before Letourneau's death, Wellman testified, Smith-Parker brought a gun into her home. She recalled waking up one morning about that time and seeing Letourneau, Smith-Parker, and an unidentified third man in the living room of her home. Wellman testified that either that day or in the next couple of days several items started showing up: a television, some movies, and a PlayStation.

Yanik-Ducharme testified that she saw Smith-Parker and Letourneau on the morning of the Johnstown apartment crimes. According to her, Letourneau woke her up that morning when he and Smith-Parker came to her home. Although she wanted to go back to sleep, Letourneau wanted to show her something. When she went downstairs, she saw a big flat-screen television. She also saw a PlayStation. The two items stayed in her home only for a couple of days before Letourneau loaded them into her car, and he and Smith-Parker left together with them.

According to telephone records admitted into evidence, Thomas, Graham, Letourneau, and Smith-Parker had all been communicating with each other by phone in the early hours on the

morning of the Johnstown apartment crimes. The last call among members of the group occurred at 3:56 a.m.

Xavier Matthews, a close friend of Letourneau, testified that Letourneau had told Matthews that he had robbed Mack. According to Matthews, Mack sold marijuana. Matthews testified that when "they" robbed Mack, Letourneau took a safe, and Matthews believed the safe contained a large amount of marijuana. According to Matthews, Letourneau had told him that they also had taken a gun from Mack.

According to trial testimony, the chain of events leading up to Letourneau's death began the night before he was shot. Graham, Letourneau, and Smith-Parker attended a rap contest at a club in Salina on the night of June 18, 2009, and then went to a party Matthews was hosting.

Matthews, as well as other witnesses, testified that both Smith-Parker and Letourneau attended his party. Matthews believed that both Letourneau and Smith-Parker were armed that night. According to Matthews, Letourneau had shown him a gun, which Matthews thought was a .357. Although Matthews did not actually see Smith-Parker with a gun, he believed that he was armed because "when he was dancing around my house he had a bulge in his pants." Matthews testified that he told both men to take the guns out to their car, and both complied with his request.

Matthews also testified that he had previously seen the two carrying guns at his house on "multiple occasions." He had seen them with two different weapons—one he believed to be a .22 and the other a .357. Matthews also believed that Letourneau and Smith-Parker regularly traded the two guns between themselves.

Yanik-Ducharme testified that she and Letourneau got into an argument while at Matthews' party. She then left. When Yanik-Ducharme arrived home, Smith-Parker, Graham, and Letourneau were there waiting for her to unlock the door. She unlocked the door, and Graham and Letourneau went inside.

Yanik-Ducharme then went to her neighbor's for a moment, before returning home. Once home, she and Letourneau argued again on their front porch; at some point during the argument, Letourneau hit her. Yanik-Ducharme walked back to the neigh-

bor's, passing Smith-Parker, who was sitting in his car, in the process. Yanik-Ducharme told Smith-Parker what had happened.

Smith-Parker then got out of his car and began arguing with Letourneau. The argument ended with Smith-Parker getting into his car and leaving. Yanik-Ducharme and Letourneau again began to argue, and then Smith-Parker returned.

Smith-Parker and Letourneau yelled at each other, and, according to Yanik-Ducharme, each had a gun. Yanik-Ducharme approached Smith-Parker and convinced him to leave. She heard Smith-Parker ask Letourneau, " 'Why he would put his hands on his wife' " and " 'Why [he would] want to treat her like that[. A]ll she does is try to provide a home for you and these kids.' "

Smith-Parker left again, and Letourneau asked Yanik-Ducharme to drive him to Wellman's home, where Smith-Parker was staying. Yanik-Ducharme did so. She testified that it was probably close to 6 a.m. by this point.

When the pair reached Wellman's, Yanik-Ducharme parked a house or two down the street. Letourneau got out and walked up to Wellman's door, while Yanik-Ducharme waited in the car.

Smith-Parker answered the door, and he and Letourneau again began to argue. During this phase of the argument, Yanik-Ducharme saw Smith-Parker throw a gun on the ground before he went back inside. Letourneau then walked back to the car.

Letourneau opened the door of the car but did not get in. According to investigators, Yanik-Ducharme told them that she heard Smith-Parker say, " 'You really want to take it there?' " and that Letourneau should " '[g]o and get his guns.' " Yanik-Ducharme said Letourneau did not get anything out of the car.

Smith-Parker came back out of the house and got in his car. Letourneau then left Yanik-Ducharme's car and walked to Smith-Parker's car and got in. The two then drove off. Yanik-Ducharme tried to follow but eventually lost them.

During cross-examination at trial, Yanik-Ducharme was asked whether Letourneau's behavior had changed during the week before his death. She said he "just wasn't acting like hi[m]self at all or he was, I don't know, he just, his mood was different and he was real secretive and didn't really spend much time with me and

the kids anymore[. H]e just . . . seemed like a different person." Yanik-Ducharme also was asked about statements Letourneau made to her. Before she could answer, the State lodged a hearsay objection.

The district judge dismissed the jury before proceeding. Defense counsel then read Yanik-Ducharme's responses to a similar line of questioning during Smith-Parker's preliminary hearing:

" 'Q. When he said he was leaving what did that mean to you, just getting away because [of] the argument or what?

" 'A. He said that me and the kids we'll never—we'll never have to see him again.

" 'Q. Okay and did he seem like he was elated about the fact or sad or upset or what if you observed it?

" 'A. He seemed like upset really weird he wasn't acting like himself.' "

The State argued that admission of the "never have to see him again" comment would mean that the State could admit other hearsay, specifically, Letourneau's statement to Yanik-Ducharme that Smith-Parker had killed Mack. According to the State, it would not be "fair that certain portions of hearsay from Justin Letourneau who is not here to confront those statements would come in."

As the discussion continued, the district judge summarized the State's argument as a *"Crawford* issue basically." See *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (Confrontation Clause issue). The State responded, "Right, it doesn't matter if it's a sworn statement, hearsay is hearsay, we still don't have an opportunity to cross examine him, we don't have an opportunity to even confront him about that." Defense counsel argued that the statement Smith-Parker sought to admit was "not going to the truth of the matter, it's going to basically what his state of mind was but it is a sworn statement that she testified to previously. . . . And now she says that he didn't say anything and she just went home." This colloquy followed:

"THE COURT: Well, the major issue we have is we have no ability under *Crawford* for confrontation.

"[THE STATE]: Right, right, either party does.

"THE COURT: It's a *Crawford* question is what we are dealing with.

. . . .

"THE COURT: Versus a hearsay per s[e].

"[THE STATE]: Unless there is some exception which I'm not sure what that would be.

"THE COURT: Well *Crawford* has a number of exceptions but not in this particular [situation].

. . . .

"THE COURT: The objection will be sustained. The court will permit you however to inquire of the witness if her statement on this date would be different without saying Mr. Letourneau said, *i.e.*, she can certainly be questioned about whether he made a statement to her. Today she says he doesn't make a statement."

Wellman also testified about the early morning of Letourneau's shooting. She said that Smith-Parker lay in bed when he returned from Letourneau's residence. At some point, Wellman saw a gun in his possession. Smith-Parker told Wellman that she needed to pack the kids up and leave for a few days because he and Letourneau were arguing. When Wellman later heard a knock on her door, she took her children into a back bedroom and shut the door.

Smith-Parker also testified at trial. He told the jury that he and Letourneau were best friends, like brothers to each other.

Smith-Parker also testified to the events surrounding Letourneau's shooting. He said that he, Letourneau, and Graham had to wait for Yanik-Ducharme to arrive at the home she shared with Letourneau after Matthews' party. When Yanik-Ducharme arrived, Letourneau and Graham got out of Smith-Parker's car, while Smith-Parker remained in it. As he waited there, Yanik-Ducharme walked by and told him that " 'Justin had pulled a gun out.' "

Smith-Parker said he then got out of the car and walked up to Letourneau's apartment. When he got to the door, he could see Letourneau coming up out of the basement. According to Smith-Parker, he confronted Letourneau and asked him why he was pulling a gun on his wife. Yanik-Ducharme then came up onto the porch where the two men were standing, and, according to Smith-Parker, Letourneau "reached around and slapped her upside the head and [Smith-Parker] grabbed [Letourneau's] arms and told him to '[s]top beating on his wife.' " Then Letourneau jerked back away from Smith-Parker and went back toward the basement. This

"concerned [Smith-Parker] a little bit" because Letourneau "normally kept a firearm" downstairs. Smith-Parker then left.

During cross-examination, Smith-Parker admitted that he then went home to get his gun. He also admitted that the gun he retrieved was a .22. At other times, he said, he had been in possession of both a .22 and a .38.

Smith-Parker testified that he eventually returned to Letourneau's apartment complex. When he did, Letourneau was sitting in Yanik-Ducharme's car and Yanik-Ducharme was standing by it. Smith-Parker said he got out of his car and Yanik-Ducharme came up to talk to him. At some point, Smith-Parker began "hollering at [Letourneau,] asking him, 'Why he was beating on his wife and why he wanted to treat her like that.' " While Smith-Parker was yelling at Letourneau, Yanik-Ducharme was trying to get Smith-Parker to get into his car and leave. Eventually, Yanik-Ducharme convinced him that she would be okay.

Smith-Parker testified that when he got home, he locked the door and went into the bedroom, where he sat and talked with Wellman. According to Smith-Parker, he told her that Letourneau had been " 'beatin[g] on his baby mom' " and that, until he stopped, she should not " 'let him back in the house.' " During this time, Smith-Parker told Wellman that she needed to leave with the children for a couple of days and not to answer if anyone came to the door.

When Letourneau's knock came, Smith-Parker went to the door and took his gun with him. When he stepped outside after seeing Letourneau through the peephole, the two men began arguing again. Smith-Parker testified that he told Letourneau: " 'You know I love you more than I love myself' " and that he threw his gun on the ground after he realized Letourneau did not have one with him. Smith-Parker then went back into the house to look for his keys, as Letourneau walked to Yanik-Ducharme's car.

Once Smith-Parker found his keys, he testified, he went back outside and got into his car. Letourneau walked up and got into the car with him, which surprised Smith-Parker because he thought Letourneau was leaving with Yanik-Ducharme. Smith-Parker again had the .22 with him, because he had picked it up from

the ground. He placed it by the gear shift between the two front seats. During cross-examination, Smith-Parker was asked why he would put the gun within reach of Letourneau if he was concerned about his potential for violence. Smith-Parker said that he did not know Letourneau would be getting into the car.

Smith-Parker then began driving; Letourneau directed him where to drive. According to Smith-Parker, he and Letourneau ended up in the country outside of Salina.

Smith-Parker testified that he parked the car and started talking with Letourneau. According to Smith-Parker, he again told Letourneau, " 'You know you got to quit beatin[g] on your baby mom.' " During this conversation, according to Smith-Parker, Letourneau began playing with the gun, at first, just pointing it out the window of the car.

But then Letourneau made a comment that prompted Smith-Parker to reply: " 'You talking stupid right now.' " Although Smith-Parker did not testify to the substance of Letourneau's comment, Smith-Parker's parole supervisor did. She said Smith-Parker had told her while he was awaiting trial that Letourneau had begun "talking about shooting himself like someone named Ronnie did." Smith-Parker testified that the gun discharged shortly after his "talking stupid" statement to Letourneau:

"[Letourneau] just had like a little smile after he made another comment to me had like a little smile like and then when he—when he pointed I told him, 'Don't point the gun,'. . . .

. . . .

". . . I told him to, 'Stop fucking pointing the gun at your head,' and he didn't do it and then I told him again and then from that point I went—I went by the thing and I went like this to try to yank the gun down and it went off."

According to Smith-Parker, he was standing outside of the car when the gun discharged. Letourneau was sitting in the front seat, and Smith-Parker had reached into the window.

Smith-Parker then described the aftermath: "[W]hen the gun went off, you know, he sat up and then I seen his eyes they crossed and then I seen blood come out his head and so then I ran around beside the car and jumped in the driver's seat and started going toward the hospital."

On the ride to the hospital, Smith-Parker testified, Letourneau was vomiting and kept falling over toward Smith-Parker. Smith-Parker said he was driving very fast and flashing his lights to alert someone that he needed help. Meanwhile, Letourneau was moaning and rubbing his chest. Once at the hospital, Smith-Parker ran inside, grabbed a wheelchair, and told the desk clerk his "bro" had been shot.

When asked whether he felt responsible for what had happened, Smith-Parker said yes.

"Yeah, I felt responsible for what happened because, you know, it's like if I never had the gun in the car, you know, then—you know then the accident probably wouldn't have happened in the first place, this wouldn't have took place, you know, if I wouldn't have had the gun in the car, but that's why—that's why I felt responsible for what happened to him. See what I'm saying, cause this is my best friend and we had this stupid argument and then here we are and then I lose him almost like this—I lose him like this so, yeah I feel responsible for what happened."

Smith-Parker said that he did not consider Letourneau's death a suicide and that Letourneau was not suicidal. He also denied that he intentionally killed his friend.

During cross-examination, Smith-Parker was confronted with the statements he had made to Gile. When asked why he told her that he had killed Letourneau, Smith-Parker repeated that he felt responsible for Letourneau's death. He also said that he had told Gile he shot Letourneau because of Letourneau's violence toward Yanik-Ducharme and because he was trying to explain what had happened. He also responded to a question on why he changed his account of the shooting from one attributing it to Letourneau's violence against Yanik-Ducharme to one attributing it to Letourneau threatening Smith-Parker. Smith-Parker said he did not remember doing so.

Smith-Parker also was asked why he stopped on the way to the hospital to dispose of the gun, if his sole concern was getting Letourneau speedy medical attention. Smith-Parker said that he had not stopped, instead throwing the gun out the window while he was driving.

In addition to these questions, the State attempted to get Smith-Parker to admit that Letourneau had actually been shot outside of Wellman's apartment. But Smith-Parker insisted that the events had occurred as he described during his direct testimony.

At the conclusion of evidence, the jury was given an instruction for first-degree murder in the death of Mack. The written instruction included the following:

"If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you *will* enter a verdict of guilty.

"If you have a reasonable doubt as to the guilt of the defendant as to the crime of murder in the first degree, then you must consider whether the defendant is guilty of murder in the second degree." (Emphasis added.)

Another jury instruction defined reasonable doubt.

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

The jury also was provided with the following jury instruction on aiding and abetting:

"A person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels, procures, another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

All of the instructions also were read aloud to the members of the jury in open court.

Within 90 minutes of beginning deliberations, the jury sent four communications to the district judge in rapid succession. The fourth communication stated: "We have an issue with one (male) juror and his ability to understand the instruction presented. Can we o[r t]he court remove him?"

The district judge and counsel believed that the juror in question was N.B., who had raised a concern about English being his second language during voir dire. The district judge and counsel for both sides agreed that it would be best to replace a juror earlier rather

than later in deliberations, but they first confirmed with the presiding juror that the issue arose as to N.B. After the presiding juror confirmed to the district judge and both parties that they had correctly identified the person that other jurors had inquired about, the district judge stated:

"Alright, counsel have believed that to be the circumstances and they have stipulated that the Court may remove this individual. At this point the procedure will be that we will call the panel back into the jury box, we will [bring alternate juror V.W.] into the gallery area, I will excuse [N.B.] . . ., we will not permit any discussion or comments to be made and then we will have [V.W.] take his seat and you may return back to deliberations at that point."

The jury then returned to the courtroom. The district judge read the jury question aloud and confirmed with the presiding juror that he had read it correctly. The presiding juror was then asked to identify the juror in question. The presiding juror identified N.B.

"THE COURT: Okay, the Court has had the opportunity to confer with counsel in this matter and with the Defendant present in chambers in regard to the question that has been propounded by the jury in this matter and presented by the presiding juror in this case.

"It is not uncommon and it is unfortunate that there are occasions when the information and material that are presented to jurors are such that it's not a good fit for a particular individual on the jury.

"We note from the Voir Dire responses in this matter that that would have been an indication given to us by the individual named in this case."

. . . .

"And, ladies and gentlemen, we now have the full compl[e]ment of 12 jurors and you are now instructed to return to the jury room and continue your deliberations and include [V.W.] into your deliberation process.

"And again you may take as much time as you need so that [V.W.] may be a participant in this matter."

*Posttrial Proceedings*

N.B. was dismissed from Smith-Parker's jury on October 29, 2010, the same day as the verdicts were returned. The following day, N.B. wrote a letter to the district judge in which he said that he was the only juror who did not believe Smith-Parker was guilty of first-degree murder of Mack at the beginning of deliberations and that he also believed Smith-Parker was guilty only of invol-

untary manslaughter of Letourneau. According to N.B., the presiding juror used language difficulties as a pretext to remove him from the jury.

On November 2, the district judge responded to N.B.'s letter with a letter explaining that he could not provide legal advice or comment on pending or impending proceedings and that N.B.'s letter would be forwarded to counsel.

After receiving a copy of N.B.'s letter, defense counsel moved for new trial based on jury misconduct and false representation to the court; counsel also moved to recall the jury.

At a hearing on the defense motions, the district judge admitted N.B.'s letter and an affidavit from the presiding juror into evidence. He advised Smith-Parker that no additional testimony would be admitted, and Smith-Parker's counsel voiced no further objection to this procedure.

The presiding juror's affidavit stated that N.B.'s removal had nothing to do with N.B.'s opinions on guilt or innocence. It also said that the other jurors were having difficulty explaining definitions of words to N.B. and that the jury started deliberations over, once N.B. was removed and the alternate juror seated.

After reviewing the evidence, the district judge noted that "[t]he clear questions by this jury begin with language issues." He ruled:

"This is not an issue of [N.B.'s] opinion or his belief or his determination of how he would vote in the case; this is a clear issue of inability to serve as a juror, based upon a language barrier in this matter. It is not a matter of several hours of deliberation, but several hours of deliberation only began after the alternate juror was seated and they again began the deliberation anew as stated in the affidavit of the presiding juror in this matter.

. . . .

"[T]he court's removal of [N.B.] had nothing to do with his opinion, the court, nor counsel, nor defense, were made aware of anything of this nature until he filed his letter and affidavit after the fact. . . .

. . . .

"The court found only that N.B. would be unable to perform his duties and counsel acknowledged, counsel have waived that argument by the stipulation that he should be removed and the court acquiesced in that stipulation and so removed [N.B.] for cause in this matter.

"The court would find on that basis that the Motion for New Trial on the basis of juror misconduct is simply not supported by the evidence as presented, the affidavits that are of the record in this matter, the court finds that there was good cause shown in the record to replace [N.B.] and there is no prejudice to the defendant in that the defendant had time to visit with counsel, outside the hearing of court and the State and in response to that stipulated on the record he as well as his attorney would ask that this juror be removed and stipulated [to] that removal along with the State in this matter."

## DISCUSSION

### *Sufficiency of Evidence on Premeditated First-Degree Murder*

Smith-Parker argues that the State's evidence of premeditation in the Mack murder was insufficient, regardless of whether he was convicted as a principal or an aider and abettor.

Our standard of review for a challenge to the sufficiency of the evidence in a criminal case is

"whether, after reviewing all the evidence in a light most favorable to the prosecution, the reviewing court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility." *State v. Lloyd*, 299 Kan. 620, Syl. ¶ 3, 325 P.3d 1122 (2014).

We begin with the proposition that "premeditation, like other elements, can be proven by circumstantial evidence." *State v. Hollister*, 300 Kan. 458, 470, 329 P.3d 1220 (2014). This court has looked at five factors to evaluate circumstantial proof of premeditation: "(1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless." 300 Kan. at 470. Not all factors must be present, *State v. Marks*, 297 Kan. 131, 140, 298 P.3d 1102 (2013), and, in some cases, one factor, standing alone, may be sufficient, *State v. Cook*, 286 Kan. 1098, 1102, 191 P.3d 294 (2008). But premeditation cannot be inferred from the use of a deadly weapon alone. *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011).

The majority of our cases dealing with sufficiency of the evidence with respect to premeditation have involved strong evidence to

support the defendant's personal performance of the *actus reus* of the crime. See *Cosby*, 293 Kan. at 134 (eyewitnesses saw defendant shoot victim); *State v. Scaife*, 286 Kan. 614, 616, 186 P.3d 755 (2008) (eyewitnesses saw defendant shoot victims); *Cook*, 286 Kan. at 1099 (defendant did not dispute he had shot, killed victim); *State v. Morton*, 277 Kan. 575, 582, 86 P.3d 535 (2004) (defendant admitted shooting victim); *State v. Scott*, 271 Kan. 103, 106, 21 P.3d 516 (defendant admitted to physical altercation with victim), *cert. denied* 534 U.S. 1047 (2001); *State v. Cravatt*, 267 Kan. 314, 319, 979 P.2d 679 (1999) (eyewitness testified defendant shot victim).

In this case, the identity evidence on who fired the .22 that killed Mack is considerably less strong. In addition, only two factors on our list of those tending to show premeditation are present. A gun is unquestionably a deadly weapon. And the forensic evidence is certainly capable of supporting a reasonable inference that Mack's assailant was not provoked: There was a forced entry through Mack's front door; the shot was likely fired from the doorway; Mack was seated or possibly in the process of standing up; and there was no evidence of a physical altercation or struggle.

The State's evidence that Smith-Parker participated in the burglaries and the murder of Mack included: Johnson's testimony that he had seen Thomas Jenkins at Mack's apartment complex on the morning of the Johnstown apartments crimes, Smith's testimony that she had seen Thomas Jenkins at the complex that morning and that he was with two other men, whose descriptions were consistent with Smith-Parker and Letourneau; Kendra Jenkins' testimony that she had seen her husband with Smith-Parker and Letourneau on the morning Mack was killed; Yanik-Ducharme's testimony that Smith-Parker and Letourneau brought a big screen television and a PlayStation into her home the same morning; Wellman's testimony that Smith-Parker and Letourneau brought DVDs, a PlayStation, and a television into her home about the time of Mack's shooting; forensic evidence of a shoeprint at the apartment complex with the word "Servus" imprinted on it; Kendra Jenkins' testimony that she accompanied her husband when he destroyed a pair of Servus boots; Matthews' testimony that "they," meaning Letourneau and at least one other person, had robbed Mack of a

safe, that Mack sold marijuana, and that Letourneau had been in possession of marijuana after Mack's murder; forensic evidence that the same gun had been used in the deaths of Mack and Letourneau; witnesses' testimony that Smith-Parker had possessed a gun of the same type on the night of Letourneau's death that was of the type used in Mack's murder.

Given all of this interlocking evidence, we conclude that Smith-Parker's jury could draw a reasonable inference that he was guilty of first-degree premeditated murder of Mack, at least as an aider and abettor. To establish guilt on the basis of aiding and abetting, see K.S.A. 21-3205, the State was required to show that Smith-Parker knowingly associated with the unlawful venture and participated "in such a way as to indicate that he facilitated the success of the venture." *State v. Robinson*, 293 Kan. 1002, 1038, 270 P.3d 1183 (2012) (quoting *State v. Baker*, 287 Kan. 345, 366, 197 P.3d 421 [2008]). The State amassed and presented sufficient circumstantial proof that the killing of Mack was premeditated and that Smith-Parker participated "in such a way as to indicate that he facilitated the success of the venture." See *Robinson*, 293 Kan. at 1038. Matthews' testimony, in particular, when combined with the forensic evidence of the shooter's and Mack's positions in the room when Mack was shot, could lead to the inference that those who committed the crime entered the apartment with the intention of killing Mack or, at a minimum, leaving no witnesses.

Our result is reinforced by our decisions in at least two prior cases. In *State v. Hoge*, 276 Kan. 801, 806, 80 P.3d 52 (2003), we ruled that evidence of the number and location of shots fired in the victim's bedroom, coupled with the presence of the target of the robbery, led to an inference the perpetrators broke into the victim's house for the purpose of killing him or preventing him from being a witness against them. In the more recent *State v. McBroom*, 299 Kan. 731, 754-59, 325 P.3d 1174 (2014), we ruled that sufficient evidence placed the defendant at the scene of a homicide because the defendant admitted to being with his accomplice; witnesses testified to seeing a car similar to the accomplice's car in the vicinity of the crime scene at the relevant time; and the

accomplice's DNA was found on a cigarette butt inside the victim's home.

*Aiding and Abetting*

Smith-Parker next argues that the instruction to the jury on aiding and abetting created alternative means of aiding and abetting.

We recently noted that such an argument raised "an interesting theoretical question," but declined to address the issue because the instruction at issue addressed only aiding, not abetting. *State v. Brown*, 299 Kan. 1021, 1032-33, 327 P.3d 1002 (2014). Interesting theoretical question or not, we also recently have ruled that acting as a principal and acting as an aider and abettor do not constitute alternative means of committing first-degree murder. *State v. Betancourt*, 299 Kan. 131, 137-41, 322 P.3d 353 (2014). The aiding and abetting statute outlines the proper assignment of criminal responsibility; it does not create distinct elements of the crimes to which it is applied. 299 Kan. at 139; see K.S.A. 21-3205. The rationale of *Betancourt* is sound, and it dictates that this issue is without merit.

*Consolidation*

We review a district judge's decision to consolidate multiple cases in three steps; each step requires us to apply a different standard of review:

"First, the court considers whether K.S.A. 22-3203 permitted consolidation. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) spells out the three conditions permitting the joining of multiple crimes in a single complaint. Whether one of the conditions is satisfied is a fact-specific inquiry, and the appellate court reviews the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. Second, because K.S.A. 22-3202 provides that charges "may" be joined, a district court retains discretion to deny a request to consolidate even if a statutory condition is met. This decision is reviewed for an abuse of discretion. Finally, if an error occurred in the preceding steps, the appellate court considers whether the error resulted in prejudice, *i.e.*, whether it affected a party's substantial rights." *State v. Hurd*, 298 Kan. 555, Syl. ¶ 1, 316 P.3d 696 (2013).

K.S.A. 22-3202(1) permits crimes to be charged in one complaint—and, thus, under K.S.A. 22-3203, permits consolidation of

complaints—when "the crimes charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." The district judge's oral statements and journal entry indicate he concluded that each of the three statutory conditions was met.

His articulated factual findings can be summarized in the following list: Smith-Parker and Letourneau had a close relationship, close to the point of considering themselves brothers, and they had common concerns about family members; evidence would support the involvement of both Smith-Parker and Letourneau in the burglaries at the apartment complex; both cases ended in the death of an individual; the events surrounding the first crime flowed into the events surrounding the other crime with "no significant interruption in the behavior and actions" of the involved individuals; law enforcement's execution of a search warrant related to Letourneau's death led to the discovery of items stolen during the burglaries; ballistics evidence demonstrated the same gun was used in each killing; the same police officers and lay witnesses would testify in each case; and the compulsory joinder rule could hamper the prosecution's ability to pursue the second case after the first was tried.

Neither party challenges the existence of substantial competent evidence to support each of these findings. Instead, on the first step of the analysis outlined above, each party focuses on whether the findings satisfied one of the conditions precedent in K.S.A. 22-3202(1) as a matter of law.

On the first statutory condition, crimes of the same or similar character, we note that earlier Kansas cases that have held consolidation or joinder to be appropriate have generally had multiple commonalities, not merely the same classification of one of the crimes charged. See *State v. Carr*, 300 Kan. 1, 101-04, 331 P.3d 544 (2014) (victims identified defendants; aspects of modus operandi consistent between crimes); *State v. Cruz*, 297 Kan. 1048, 1055, 307 P.3d 199 (2013) (both victims leaving nightclub at closing time; both accosted before reaching vehicle; both had little warning before shot repeatedly; same gun used; defendant identified in

both cases; both cases charged first-degree murder, criminal possession of firearm); *State v. Gaither*, 283 Kan. 671, 687, 156 P.3d 602 (2007) (both victims drug dealers; defendant on quest for drugs during both; both victims shot with 9 mm handgun; both occurred in private dwellings; 5-day time span); *State v. Barksdale*, 266 Kan. 498, 506-10, 973 P.2d 165 (1999) (both crimes murder; victims killed in similar manner; robbery common motive); *State v. Crawford*, 255 Kan. 47, 48, 53-54, 872 P.2d 293 (1994) (both crimes robbery; victims identified defendant; similar modus operandi).

Here, although each case involved a single homicide, the homicides lacked many other similarities. The murder of Mack was tied to a burglary, apparently targeted at a large amount of marijuana in his possession. Mack was apparently shot suddenly from across the room while he was seated or in the process of standing up to face at least one of the burglars. In contrast, Letourneau and Smith-Parker, as the district judge found, were so close that they considered themselves brothers and had spent much of several days in one another's company. Letourneau's death followed an argument between him and Smith-Parker over Letourneau's treatment of Letourneau's girlfriend. Whether that argument provided a motivation for the fatal shooting or the shooting was accidental or a suicide was disputed. On this slim record, we cannot say as a matter of law that the first statutory condition for consolidation or joinder was met.

It is plain that the second statutory condition—the cases or crimes were based on the same act or transaction—is inapplicable.

We therefore move to consideration of the third statutory condition—whether the cases or crimes were based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

We agree with the defense that certain of the district judge's factual findings should have contributed little to his legal analysis of this statutory condition.

In *Hurd*, 298 Kan. at 562, the district judge had said: " '[T]he temporal proximity of these two charges are closely related, and it appears the witnesses would be mostly the same as well, at least some of the same witnesses, and based upon the court calendar,

these two cases will be consolidated and are consolidated for trial.' "

We clarified that the "connected together" phrase from the third statutory condition precedent would be applicable in three situations: (1) when the defendant provided evidence of one crime while committing another; (2) when some of the charges were precipitated by other charges; or (3) when all of the charges stemmed from a common event or goal. 298 Kan. at 562 (citing *State v. Donaldson*, 279 Kan. 694, 699-700, 112 P.3d 99 [2005]).

We rejected the notion that a trial court's calendar was a valid consideration for consolidation. We then turned to the remaining two rationales articulated by the district judge to support the third statutory condition, including the judge's reliance on the defendant's father providing evidence of one of defendant's crimes while reporting defendant's commission of another crime. 298 Kan. at 562-63.

We rejected the idea that temporal proximity and similar witnesses were sufficient bases for joinder or consolidation under the third statutory condition precedent. 298 Kan. at 563. And we rejected the idea that the defendant's father's evidence satisfied the "connected together" statutory condition because it was available only if the "*defendant* provides evidence of one crime while committing another." 298 Kan. at 563. In *Hurd*, the defendant's father's evidence was not sufficient. See 298 Kan. at 563; see also *State v. Anthony*, 257 Kan. 1003, 1016-17, 898 P.2d 1109 (1995) (police taped conversation between defendant, informant to whom defendant was selling cocaine; during conversation, defendant provided direct evidence of his involvement in robbery, murder; sale of cocaine charge thus connected with robbery, murder charges).

Thus, under the guidance of *Hurd*, we cannot rely on mere temporal proximity or similar witnesses to support the district judge's consolidation decision under the third statutory condition in this case. Nor can we rely on the fact that officers found items stolen during the burglaries while searching for evidence related to Letourneau's death. Smith-Parker did not personally provide "evidence of one crime while committing another crime." See 298 Kan. at 563.

There are, however, sufficient other ties between Smith-Parker's two cases to support the judge's legal conclusion under the third statutory condition.

The ballistics evidence is the strongest among those ties. It demonstrated that the gun used to shoot Mack was the same gun used to shoot Letourneau. Shell casings at both crime scenes matched. The district judge specifically made a factual finding that the ballistics evidence tied the two crimes together. That finding alone is sufficient to satisfy the third statutory condition.

Our conclusion is further bolstered by the evidence that ultimately came out at trial. Smith-Parker admitted he had been in possession of the gun after Letourneau was shot and had disposed of it during his race to the hospital. His choice to dispose of the gun when his friend was bleeding from a head wound was particularly damaging evidence for the defense. And other evidence reinforced that a .22 had been seen in the possession of Smith-Parker and Letourneau in the period of time covering both crimes.

In short, the evidence supporting Smith-Parker's conviction of the second crime also tended to support his conviction of the first crime. The ballistics evidence from the scenes and Smith-Parker's admission of possession and disposal of the gun used in the second crime, along with witnesses' observations of such a gun being traded contemporaneously between him and Letourneau, helped to place Smith-Parker at the scene of and participating in Mack's murder. The two crimes—and the two cases that arose out of them—were sufficiently "connected together" to satisfy K.S.A. 22-3202(1).

Having determined that one of the statutory conditions was present as a matter of law, we turn to whether the district judge abused his discretion by choosing to consolidate the cases for trial. See *Hurd*, 298 Kan. 555, Syl. ¶ 1.

Judicial discretion is abused if judicial action

"(1) is arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State*

*v. Ward,* 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

The burden of demonstrating error is on the party alleging the abuse. *State v. Burnett,* 300 Kan. 419, 449, 329 P.3d 1169 (2014); see also *State v. Tague,* 296 Kan. 993, 1002, 298 P.3d 273 (2013) (burden of showing abuse of discretion on party claiming error).

Smith-Parker's arguments do not focus clearly on this step; the only portion that could be construed as addressing it is his argument that consolidation led to prejudicial admission of other-crimes evidence under K.S.A. 60-455. But " 'Kansas case law and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455.' " *Gaither,* 283 Kan. at 688 (quoting *Barksdale,* 266 Kan. at 510).

We hold that the district judge's consolidation of the two cases against Smith-Parker was not error. We need not reach the third step under *Hurd, i.e.,* whether any error in consolidation demands reversal.

### *Letourneau's Out-of-Court Statement*

At trial, Smith-Parker sought to introduce a statement Letourneau made to Yanik-Ducharme in the hours before his death. According to Yanik-Ducharme, Letourneau told her that "[she] and the kids we'll never—we'll never have to see him again." The district judge ruled that the statement was inadmissible and said that it would pose a Confrontation Clause issue under *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and no hearsay exception applied.

The district judge's Confrontation Clause ruling was based on a faulty premise—that the State has a right of confrontation equal to that of a defendant. This is not the case. *Crawford* held that "a witness' testimonial statements *against a defendant* are inadmissible unless the witness appears at trial or, if the witness is unavailable to testify at trial, *the defendant* had a prior opportunity for cross-examination." (Emphasis added.) *State v. Bennington,* 293 Kan. 503, 508, 264 P.3d 440 (2011); see *Crawford,* 541 U.S. at 42 ("The Sixth Amendment's Confrontation Clause provides that, '[i]n

all criminal prosecutions, *the accused shall enjoy* the right . . . to be confronted with the witnesses against him.' " [Emphasis added.]).

The admissibility of Letourneau's statement therefore should have been analyzed only under our hearsay statutes.

Hearsay is any statement "which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 60-460.

Smith-Parker argues that the Letourneau statement was not offered for the truth of the matter asserted, *i.e.*, that Letourneau would literally never see Yanik-Ducharme or the children again, but instead to demonstrate Letourneau's state of mind, *i.e.*, that "Letourneau was so riddled with guilt over his treatment of Yanik-Ducharme that he would contemplate suicide."

"Ordinarily a statement offered merely to show the declarant's state of mind is admissible. This is true either because it is not offered to show the truth of the matter asserted and therefore does not qualify as hearsay in the first place, see [*State v.*] *Boldridge*, 289 Kan. [618,] 634, [215 P.3d 585 (2009)]; or, even if it qualifies as hearsay, it fits under a statutory exception for statements describing the then-existing state of mind of the declarant, see K.S.A. 60-460(l)." *State v. Cosby*, 293 Kan. 121, 128, 262 P.3d 285 (2011).

In *State v. Becker*, 290 Kan. 842, 847, 235 P.3d 424 (2010), we held that statements, such as: " '[T]hey shut the door and said if anybody comes out of here we're going to shoot them,' and 'They told me that they were going to be back at 5:00 a.m. and I better have drugs or money or they were going to kill me' " did not constitute hearsay "because they were not presented to prove the truth of the assertions." We noted that "[i]t is irrelevant and unnecessary to know, for example, whether [defendant's two accomplices] really would have shot anyone who attempted to leave the back bedroom while they interrogated [two victims]." 290 Kan. at 847. We drew a contrast between the statements in issue there and the one in issue in *State v. Harris*, 259 Kan. 689, 699, 915 P.2d 758 (1996), "where the out-of-court threatening statement was offered to prove" the truth of the threat communicated in order to demonstrate "premeditation in the killing of the person about whom the threat was made." *Becker*, 290 Kan. at 847. In *Becker*, "the

threats were offered as explanations for why the people who heard the threats responded as they did—staying in a room, for example, or leaving for another town." 290 Kan. at 847. In other words, the threats were admitted to demonstrate the effect they had on those who heard them, not their literal truth.

Similar to the statements in *Becker*, the literal truth of the statement in this case was irrelevant to Smith-Parker's defense. Whether Yanik-Ducharme and the children would see Letourneau again had no bearing on the case. But the fact that Letourneau said it could be revealing about why he would shortly thereafter wave a gun around recklessly and point it at his own head. It was error for the district judge to exclude Yanik-Ducharme's testimony about Letourneau's statement.

Because this is not the only error we detect in Smith-Parker's trial, we defer our discussion of reversibility to our cumulative error discussion section below.

*Jury Instruction*

Smith-Parker next argues that the jury instruction on alternative first-degree murder theories contained a misstatement of law with respect to reasonable doubt. The instruction read: "If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you *will* enter a verdict of guilty." (Emphasis added.) According to Smith-Parker, the instruction should have been identical to the general reasonable doubt instruction that was also given. That instruction said: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you *should* find the defendant guilty." (Emphasis added.)

Because Smith-Parker did not object to the jury instruction he now complains of on appeal, we review this issue for clear error. See K.S.A. 22-3414(3).

"To determine whether an instruction or a failure to give an instruction was clearly erroneous, the reviewing court must first determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record."

"If the reviewing court determines that the district court erred in giving or failing to give a challenged instruction, then the clearly erroneous analysis moves to a reversibility inquiry, wherein the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *State v. Williams*, 295 Kan. 506, Syl. ¶ ¶ 4, 5, 286 P.3d 195 (2012).

This court addressed a similar instruction challenge in *State v. Lovelace*, 227 Kan. 348, 607 P.2d 49 (1980). The questioned *Lovelace* instruction told jurors that they "must" find defendant guilty if they had no reasonable doubt on the elements of the crime. 227 Kan. at 354. This court rejected Lovelace's argument that "must" commanded the jury to find the defendant guilty and noted that "should" and "must" could be used interchangeably in criminal instructions. 227 Kan. at 354. Smith-Parker acknowledges this precedent but argues that it was wrongly decided. We agree with him and overrule the *Lovelace* holding.

Although we have rejected a defense argument that a criminal jury should be instructed on its inherent power of nullification, see *State v. Naputi*, 293 Kan. 55, Syl. ¶ 4, 260 P.3d 86 (2011) (juries possess power to decide case contrary to applicable facts and law, *i.e.*, power of jury nullification, but defendant not entitled to instruction on power), the district judge's instruction in this case went too far in the other direction. It essentially forbade the jury from exercising its power of nullification. *Cf. State v. McClanahan*, 212 Kan. 208, Syl. ¶ 3, 510 P.2d 153 (1973) ("Although it must be conceded that the jurors in a criminal case have the raw physical power to disregard both the rules of law and the evidence in order to acquit a defendant, it is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon."). Both the wording of the instruction at issue in *Lovelace*—"must"—and the wording at issue here— "will"—fly too close to the sun of directing a verdict for the State. A judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt.

As with the erroneous exclusion of Letourneau's out-of-court statement, we do not proceed to analysis of whether this instruc-

tional error required reversal standing alone. Rather we consider it with other identified errors in our cumulative error discussion section below.

*Failure to Instruct Jury to Begin Deliberations Anew*

After juror N.B. had been dismissed and replaced by alternate V.W., the district judge told the members of Smith-Parker's jury: "[Y]ou are now instructed to return to the jury room and *continue* your deliberations and include [V.W.] into your deliberation process." (Emphasis added.)

When a juror is replaced after deliberations have begun, the district judge must instruct the jury to begin its deliberations anew. See *State v. Cheek*, 262 Kan. 91, Syl. ¶ 1, 936 P.2d 749 (1997) ("The substitution of an alternate juror for an original juror after deliberations have begun is constitutionally permissible where good cause has been shown and the jury has been instructed to begin deliberations anew."). The parties agree that the district judge erred by not instructing the jury to begin its deliberations anew in this case. See 262 Kan. 91, Syl. ¶ 3.

Again, we defer our analysis of this error's reversibility to our cumulative error discussion section below.

*Motion to Recall Jury*

Smith-Parker argues that the district judge erred in not granting his motion to recall the jury after N.B. had alleged that the other jurors requested that he be removed based on his voting position. Our review of a district judge's decision on a motion to recall is limited to abuse of discretion. State v. Jenkins, 269 Kan. 334, 338, 2 P.3d 769 (2000).

"However, '[i]f a defendant's constitutional right has been violated during a trial, a judge's discretion to deny a motion . . . to recall a jury is limited. At this point, there is greater reason for the judge to articulate the reasons for his or her "discretionary" decision.' *Jenkins*, 269 Kan. at 338. Whether a defendant's due process rights were violated is a question of law over which this court exercises unlimited review. *Hemphill v. Kansas Dept. of Revenue*, 270 Kan. 83, 89, 11 P.3d 1165 (2000)." *State v. Kirkpatrick*, 286 Kan. 329, 351, 184 P.3d 247 (2008), *overruled on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (2013).

The State argues that any error in failing to recall the jury in this case qualifies as invited, because it was Smith-Parker's counsel who suggested replacing N.B. when the presiding juror asked if N.B. could be removed. Smith-Parker's counsel did ultimately agree to the replacement, but our review of the record on appeal persuades us that the State was the first to suggest that removing N.B. and replacing him would be appropriate. Be that as it may, the judicial ruling Smith-Parker now challenges on appeal is not the removal and replacement during deliberations, but the failure to recall any of the members of the jury to testify live once N.B. raised the issue of jury misconduct in his letter to the judge after the trial. The invited error argument misses this mark.

With respect to the propriety of recalling the jury, this court has said:

"Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order. *Walters v. Hitchcock,* 237 Kan. 31, 36, 697 P.2d 847 (1985)." *State v. Ruebke,* 240 Kan. 493, 513, 731 P.2d 842 (1987).

This court has also stated:

"Where a party alleges jury misconduct, the trial judge is required to recall the jury if the judge cannot determine that the evidence supporting the other party is substantial and that the jury misconduct did not relate to a material issue in dispute. When the jury is recalled, a juror may be questioned or evidence received as to physical facts, conditions, or occurrences of a juror's misconduct, either within or without the jury room, which were substantially material to the issues being determined." *Saucedo v. Winger,* 252 Kan. 718, Syl. ¶ 3, 850 P.2d 908 (1993).

In this case, the defense did not initially claim jury misconduct. Rather, the possibility of its existence and magnitude sufficient to fatally pollute Smith-Parker's convictions came to the district judge's and the parties' attention because of N.B.'s posttrial letter to the judge. In that remarkably literate document, N.B. asserted

that his fellow jurors had sought his dismissal because of his leanings toward the defense rather than his inability to understand his second language of English as it was used in the jury's instructions.

N.B.'s unsolicited letter contradicted at least the impression left, if not deliberate misinformation imparted, by the presiding juror during trial and in a posttrial affidavit. Although N.B.'s voir dire responses may also have contributed to a context ripe for misunderstanding by the district judge, they did not resolve the contradiction between his later letter and the presiding juror's later representations. Indeed, we see no way the contradiction could have been resolved short of calling N.B. and the presiding juror back into the courtroom to testify live about events during deliberations. Their competing versions of those events could then be fully explored, their credibility fully evaluated, and a factual determination made as to whether any jury misconduct occurred. This was what the defense sought, and it was entitled to it. Failure to recall at least N.B. and the presiding juror was error.

We need not address whether this error was harmless or reversible standing alone, because we take up the issue of reversibility in our cumulative error discussion section below.

*Cumulative Error*

We have found four errors: the exclusion of Letourneau's out-of-court statement, the faulty jury instruction, the failure to instruct the jury to begin its deliberations anew after N.B. was replaced with an alternate juror, and the denial of Smith-Parker's motion to recall at least N.B. and the presiding juror to investigate the allegation of jury misconduct.

"Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009)." *State v. Hart*, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013).

"In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the out-

come of the trial is such that collectively they cannot be determined to be harmless." *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

"In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." 293 Kan. at 205-06.

" 'The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial.' " *State v. Magallanez*, 290 Kan. 906, 926, 235 P.3d 460 (2010).

The State's evidence against Smith-Parker cannot be characterized as overwhelming. The evidence of Smith-Parker's premeditation in the murder of Mack was purely circumstantial. The evidence of exactly how Letourneau came to be shot in the head was conflicting, far from conclusive. The district judge's erroneous exclusion of Yanik-Ducharme's testimony about Letourneau's statement prevented Smith-Parker from presenting one of the few pieces of evidence he had to corroborate at least one of his versions of the events.

In addition, the three other errors we have identified are serious. Each calls into question the fairness of the trial that Smith-Parker received. The instruction error and the failure to tell the jury to begin its deliberations anew with the alternate juror incorrectly informed the jury about how to pursue its deliberations. The failure to recall N.B. and the presiding juror to testify live prevented a full investigation of whether jury misconduct occurred.

Under these circumstances, we must reverse Smith-Parker's convictions under the cumulative error doctrine. The combination of the overall weakness of the evidence against him and multiple serious procedural defects tainting the process mean Smith-Parker was substantially prejudiced under the totality of the circumstances and denied a fair trial. See *Magallanez*, 290 Kan. at 926. The consolidated cases must be remanded to the district court for further proceedings.

## Conclusion

Cumulative error requires reversal of all of Smith-Parker's convictions and remand to the district court for further proceedings.

MICHAEL J. MALONE, Senior Judge, assigned.