NOT DESIGNATED FOR PUBLICATION

No. 114,762

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

XAVIER OTERO,
*Appellant*.


MEMORANDUM OPINION

Appeal from Johnson District Court; BRENDA M. CAMERON, judge. Opinion filed September 22, 2017. Affirmed.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before POWELL, P.J., ATCHESON, J., and FAIRCHILD, S.J.


ATCHESON, J.: A confession is among the most powerful weapons in a prosecutor's arsenal, for a jury can use it to convict a defendant with his or her own words. Despite repeatedly admitting to police the marijuana they found in a car was his, Defendant Xavier Otero went to trial in Johnson County District Court. Otero's lawyer tried to defuse the confession. But the jury saw things more the prosecutor's way and convicted Otero of possession of marijuana. On appeal, Otero continues to crab away from his confession with an array of purported trial errors, ranging from the denial of his motion to suppress the marijuana to misbegotten hearsay rulings and misapplication of

1

his past drug conviction to elevate this crime from a misdemeanor to a felony. We find nothing among those claims warranting relief, so we affirm Otero's conviction and sentence.

FACTUAL AND PROCEDURAL HISTORY

The basic facts of the underlying criminal episode are fairly straightforward. We start there. A pair of Lenexa police officers stopped a sedan during the early evening of April 18, 2014, because the license plate had been taped to the rear window in a way that obscured the tag number. Officer Nicholas Rueve later testified that he could not read the license plate until the car pulled over and he walked up next to the back window. Officer Rueve then spoke with Candace Pruitt, the driver of the car. Meanwhile, Officer Curtis Weber kept a watchful eye on Otero and Onelio Garcia, who were Pruitt's passengers.

Rueve asked Pruitt for her driver's license. She said her purse was in the trunk and requested permission to get it. When Pruitt opened the trunk both officers smelled raw marijuana. Weber also saw the torn corner of a plastic sandwich bag in the passenger compartment of the car, which he considered indicative of drug trafficking. The officers searched the car and found a reusable canvas tote bag in the trunk that contained a smartphone and four sandwich bags with what appeared to be marijuana. Rueve held up the canvas bag and asked who it belonged to. Otero raised his hand and said the marijuana was his. The officers arrested Otero and allowed Pruitt and Garcia to leave.

After Otero waived his *Miranda* rights at the police station, Rueve questioned him for about 25 minutes. Otero reiterated that the marijuana was his. He said he bought it earlier in the day. The smartphone, however, was registered to Garcia. That prompted Rueve to suggest to Otero at least a couple of times that the marijuana really was Garcia's and Otero shouldn't take the fall for his friend. Otero continued to claim ownership of the

2

marijuana. He explained Garcia had loaned him the phone for the day, so he put it in the tote bag.

A lab test confirmed the sandwich bags contained just under an ounce of marijuana. The district attorney's office charged Otero with felony possession of marijuana, relying on an earlier conviction from Florida for possession of marijuana to increase the crime from a misdemeanor to a felony. Otero filed a motion to suppress the marijuana as the product of an unconstitutional search. The district court denied the motion.

The case was presented to a jury in a single day in June 2015. The prosecutor called the two officers and the analyst from the lab as witnesses. Rueve told the jury about Otero's repeated confessions that the marijuana was his. Otero did not testify in his own defense or offer any other witnesses. The jury convicted Otero of felony possession of marijuana as charged. The district court later placed Otero on probation for 12 months with an underlying prison sentence of 11 months. Otero has timely appealed.

LEGAL ANALYSIS

On appeal, Otero has raised six claims of error. As a matter of convenience, we take them up in the order they occurred during the prosecution of the case, which is to say chronologically. We augment the facts and procedural history as necessary to place each issue in context.

*Denial of Motion to Suppress*

Before trial, Otero filed a motion to suppress the marijuana and other evidence seized from the car on the grounds the officers lacked reasonable suspicion for the traffic

3

stop or, alternatively, impermissibly extended the stop. The district court denied the motion.

When law enforcement officers stop a motor vehicle for a traffic offense, they effect a seizure within the meaning of the Fourth Amendment to the United States Constitution. To render the seizure constitutionally reasonable, an officer must have reasonable suspicion that an offense is occurring, has occurred, or is about to occur. *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014); *State v. Pollman*, 286 Kan. 881, 889-90, 190 P.3d 234 (2008) (investigatory stop constitutionally justified when, based on known facts, "an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime"). If so, the officer may stop the vehicle to investigate the suspected violation. The officer may detain the vehicle and its occupants for the time reasonably necessary to conduct that investigation and to issue a citation or take other action if the circumstances establish probable cause to believe an offense has been committed. *Jones*, 300 Kan. at 639-40. An officer conducting a routine traffic stop typically may request the driver's license and the vehicle registration and run a computer check to verify that information and to look for outstanding warrants. *State v. Morlock*, 289 Kan. 980, 985-86, 218 P.3d 801 (2009).

Under Kansas law, a driver must display the motor vehicle's assigned license plate on the rear of the vehicle "in place and position to be clearly visible . . . and in a condition to be clearly legible." K.S.A. 2016 Supp. 8-133. And the motor vehicle must have a light that will render the plate legible from 50 feet away. K.S.A. 8-1706. A display violation is a misdemeanor punishable by a fine, a jail sentence, or both. K.S.A. 8-149. A lighting violation is a traffic offense punishable by a fine. K.S.A. 2016 Supp. 8-2118. A law enforcement officer may issue a citation for a violation of either of those provisions.

In reviewing a district court's ruling on a motion to suppress, we apply a bifurcated standard. We accept factual findings if they are supported by competent evidence having

4

some substance and exercise plenary review over legal conclusions based upon those findings, including the ultimate ruling on the motion. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016); *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007). The State bears the burden of proving a search or seizure to be constitutionally permissible by a preponderance of the evidence. *Patterson*, 304 Kan. at 272; *Pollman*, 286 Kan. at 886.

As we have indicated, Officer Rueve testified that the license plate had been taped to the rear window of Pruitt's car. As a result, the license plate was affixed on a sharp angle conforming to the slope of the rear window. From his patrol car, Rueve could tell there was a license plate in the window, but he could not see the face of the plate. According to Rueve, he could not read the license plate number until he stood right behind the car and looked down through the rear window.[1]

[1]Without objection, the State requested that the transcript of the preliminary hearing be considered as part of the evidentiary record in the suppression hearing. Officer Rueve testified at both hearings. The detailed description of the location and legibility of the license plate draws in part on Officer Rueve's testimony at the preliminary hearing.

The district court issued a written order denying Otero's motion to suppress. The district court credited Officer Rueve's testimony regarding the legibility of the license plate. In turn, the officers had the right to investigate a violation of K.S.A. 8-133. The investigation reasonably included a request for Pruitt's driver's license, since verifying her identity would be necessary for writing a citation. The district court also credited the officers' testimony they smelled marijuana when Pruitt opened the trunk of the car to get her driver's license. The marijuana odor furnished reasonable suspicion for the officers to search the trunk for its source. The district court, therefore, found the initial stop and the following search to be constitutional and the marijuana properly seized as evidence.

5

Given the district court's factual findings, which are supported in the evidence, we believe the stop and resulting search to have been constitutionally acceptable. The license plate had been taped to the rear window of Pruitt's car in a manner that rendered it unreadable from another vehicle or any appreciable distance. It was legible only from a downward vantage point immediately behind the window. The display of the license plate, therefore, violated K.S.A. 8-133. As the district court concluded, the officers, therefore, had lawful grounds to stop the car and inquire of Pruitt, including asking for her driver's license.

As we have outlined, Pruitt's retrieval of her driver's license from the trunk reasonably prompted the officers to believe they would find marijuana there, furnishing probable cause for a constitutionally permissible search of the car. See *State v. Lundquist*, 48 Kan. App. 2d 180, Syl. ¶ 2, 286 P.3d 232 (2012) (If law enforcement officers have probable cause to believe a motor vehicle contains contraband or evidence of a crime, they may conduct a warrantless search of the vehicle.). Otero has not challenged the search of the tote bag itself. We, therefore, find no error in the district court's ruling denying the motion to suppress.

Otero contends that when Officer Rueve saw the car had a valid license plate, he no longer had any legal basis to continue the traffic stop or to ask Pruitt for her driver's license. According to Otero, that rendered the continued seizure and eventual search of the car unlawful and requires suppression of the marijuana. We are unpersuaded.

Officer Rueve didn't stop the car because he thought it had no license plate—he testified he saw what he believed to be a plate taped to the window. He determined the license plate was not lawfully displayed so that the identification number was "clearly visible" or "clearly legible," as required under K.S.A. 2016 Supp. 8-133. And a violation of K.S.A. 2016 Supp. 8-133 is a comparatively serious offense as traffic matters go. That Officer Rueve could read the license plate after he walked up to the car's rear window and

looked down doesn't somehow undo the violation. At that point, he may have formally verified that the car, indeed, had a license plate. But the license plate remained improperly displayed and, thus, in violation of K.S.A. 2016 Supp. 8-133. So Officer Rueve had a right to continue his investigation by determining the identity of the culprit, running a warrants check, and confirming the license plate was assigned to the car he had stopped. In otherwise properly performing those tasks, he discovered the marijuana. The process leading to that discovery did not violate Otero's Fourth Amendment rights in the manner he has alleged.

Otero attempts to bolster his argument with a pair of cases involving temporary registration permits or similar documents. The authority fails to advance his position with respect to display of a permanent license plate.

In *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006), a Kansas Highway Patrol trooper made a nighttime stop of a car because, in the dark, he could not read the temporary tag affixed to its window. As he walked up to the car, the trooper could see it had a valid temporary tag from Colorado, thereby dispelling his concern that prompted the stop. Nonetheless, the trooper asked for the driver's license and the car registration. He then continued the stop to run a computer check based on those documents. After doing so, the trooper asked to search the car. The driver assented. And the trooper found a cache of illegal drugs. The federal appellate court reversed the district court's denial of the driver's motion to suppress. Although the appellate court found the stop itself to be legally justified, it held that the trooper impermissibly extended the stop. 438 F.3d at 1048, 1051. As soon as the trooper determined the car had a valid temporary tag, he should have so informed the driver and allowed her to leave. The court reasoned that a temporary tag rendered unreadable because of conditions outside the driver's control, such as darkness or heavy fog, would not alone support an extended traffic stop or an investigatory detention for a violation of K.S.A. 8-133. 438 F.3d at 1050-51.

7

The circumstances here differ from those in *Edgerton*. First, we have no external condition that caused the license plate on Pruitt's car to be unreadable. The physical placement of the plate against the rear window rendered it illegible. So nothing about the license plate or its illegibility in this case provides even an arguable excuse for a violation of K.S.A. 8-133. Officer Rueve, therefore, had good grounds to continue his investigation of a violation of K.S.A. 8-133 and to request Pruitt's driver's license for that purpose, thereby properly extending the traffic stop.

Second, the *Edgerton* decision at least implicitly seems to treat the temporary tag differently from a permanent license plate because it was necessarily more difficult to read. The date on the temporary tag was hand-lettered, and the identification number may be smaller than what appears on a permanent plate. The placement of the temporary tag in the rear window, where it was unilluminated, conformed to Colorado law. But that may not be consistent with Kansas law, which does not seem to explicitly regulate the placement of temporary tags, and plainly would violate Kansas law for permanent license plates, since they must be illuminated after dark. So while the law may be forgiving as to temporary tags—they are, after all, temporary—it is not similarly disposed toward permanent license plates. License plates serve important public purposes. They provide a unique means of identifying a vehicle from a distance, a useful law enforcement tool. And they allow law enforcement officers to quickly determine the registered owner of an unoccupied vehicle in a precarious circumstance. Kansas, therefore, treats the failure of a motor vehicle to have a license plate that is both readily visible and legible as a serious traffic violation. Officer Rueve properly investigated such a violation in this case.

Otero also relies on *City of Manhattan v. Enlow*, No. 100,104, 2009 WL 596555 (Kan. App. 2009) (unpublished opinion), although it is farther afield. In that case, a police officer pulled Daniel Enlow over because the van he was driving did not appear to have either a license plate or a temporary tag. The van actually displayed a valid auctioneer's transport permit—something totally foreign to the officer but an entirely

8

proper substitute for a license plate under the circumstances. The officer proceeded to investigate Enlow for driving the van in violation of K.S.A. 8-133 and determined his driver's license had been suspended. The officer cited Enlow for driving while suspended.

This court held that the officer's ignorance of law with respect to the transport permit required the suppression of the evidence of the suspension of Enlow's driver's license and the reversal of his conviction. But for his legal error, the officer would have recognized the transport permit for what it was and terminated the traffic stop at that point—without then investigating the status of Enlow's driving privileges. 2009 WL 596555, at *3. But *Enlow* is inapposite. Officer Rueve did not initiate or extend the stop of Pruitt's car based on a legal error. Given the record evidence, Pruitt's display of the license plate appears to be a bona fide violation of K.S.A. 8-133. And at the very least, Officer Rueve had ample reason to presume it to be.

Otero also argues that his incriminating statements professing ownership of the marijuana should have been suppressed as evidence because they were the direct product of an unconstitutional stop and search of Pruitt's car and, thus, irreparably tainted. In the vernacular of the law, Otero contends his admissions were fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). As we have said, however, the stop and Officer Rueve's investigation were lawful, so there was no poisonous tree growing out of a predicate violation of the Fourth Amendment to taint the statements as fruit or evidence.

*Exclusion of Text Messages as Hearsay*

During the trial, Otero's lawyer attempted to admit two text messages from the smartphone the police found in the tote bag. The first was an exchange consisting of a message from an unknown sender wishing the recipient a happy birthday followed by a reply message saying, "Thank you." The second message from another unknown sender

9

appears to be an offer to buy a "dime bag," which Otero's lawyer represented was slang for a quantity of marijuana or other illegal drugs. There was no response to that message.

The prosecutor objected to the messages as inadmissible hearsay. During a short bench conference, Otero's lawyer told the district court he did not intend to call the persons who sent the messages or Garcia to provide a foundation for them. He argued they were not hearsay at all. The district court sustained the objection. Otero's trial lawyer proffered screen shots of the messages, and they have been included in the appellate record. As part of the proffer, the lawyer represented that he would offer evidence that the first message was sent on Garcia's birthday. We consider the evidentiary issue preserved for our review.

As a general proposition, hearsay statements are inadmissible. K.S.A. 2016 Supp. 60-460. Hearsay is defined as a statement made other than by a witness testifying in court offered to prove the truth of the matter stated. K.S.A. 2016 Supp. 60-460. Broadly, then, hearsay is an out-of-court statement presented to prove the representations in the statement. Hearsay encompasses oral expressions; nonverbal conduct intended as communication, such as a nod of the head; and information in documents. See K.S.A. 60-459(a).

Depending on the reason an out-of-court statement is being offered as evidence, it may not be hearsay at all. A statement can be properly offered for a purpose wholly apart from the substantive meaning of its content. For example, if John Doe's fluency in English were a disputed issue in a case, a witness could testify that on a particular occasion she heard Doe say (in English), "It's raining, and the roads are getting slick." The witness' testimony would not be offered to prove that it was raining that day or the conditions of the road—the matters Doe asserted—but that Doe, indeed, could speak English. See *State v. Smith-Parker*, 301 Kan. 132, 161-63, 340 P.3d 485 (2014) (recognizing hearsay exclusion inapplicable to statements not offered for their truth and

10

applying rule). Similarly, statements that have independent legal significance, such as the terms of a contract, are considered verbal acts rather than hearsay. See *In re Estate of Moore*, 53 Kan. App. 2d 667, 675, 390 P.3d 551 (2017) ("verbal acts" not hearsay); *Schindler v. Seiler*, 474 F.3d 1008, 1110-11 (7th Cir. 2007) (Statements that entail "verbal acts," such as "words of contract," are not hearsay.).

Even if a statement is hearsay, it may come within one or more of the numerous statutory exceptions to the general rule of exclusion. See K.S.A. 2016 Supp. 60-460. But simply because a hearsay statement fits in one of the exceptions does not make it admissible evidence. The statement still must be relevant to be admitted.

Again, as a general proposition, all relevant evidence should be admitted. K.S.A. 60-407(f) (except as otherwise provided, "all relevant evidence is admissible"). Relevant evidence makes a disputed, material fact either more or less likely true. In turn, the Kansas Supreme Court has recognized that relevance requires both probativeness and materiality. *State v. Boleyn*, 297 Kan. 610, Syl. ¶ 1, 303 P.3d 680 (2013). To be probative, the evidence must have some "tendency in reason to prove a fact." To be material, the evidence must bear on a disputed fact that has significance in resolving the legal controversy. 297 Kan. 610, Syl. ¶ 1. Because the district court ruled the two communications from the smartphone were hearsay and did not fall within a recognized exception, it sustained the prosecutor's objection without considering relevance. We, however, may do so on appellate review.

Unlike the district court, which had to rule in the midst of a jury trial, we may take essentially limitless time to unpack and study the components of this issue. We have carefully examined the circumstances at some length and conclude the smartphone messages were not actually hearsay in light of the reasons they were offered as evidence. In that respect, the district court erred. But, as we explain, the birthday message was not material, and the offer to buy drugs was not probative. Neither, therefore, was relevant.

11

So, the district court reached the right result in excluding them. We may affirm a district court arriving at the correct outcome even if it has relied on mistaken reasons. *State v. Robinson*, 293 Kan. 1002, 1025, 270 P.3d 1183 (2012). This is such an instance.

Although Otero's trial lawyer failed to explain with surgical precision the detailed basis for offering the text messages, he clearly submitted they were not hearsay and would show the smartphone belonged to Garcia and, in turn, the marijuana was his, too. We gather the extended evidentiary chain the lawyer wanted to establish went something like this: (1) The smartphone belonged to or was regularly used by Garcia; (2) the regular user of the phone sold marijuana; and (3) the phone was found in the tote bag with the marijuana. Ergo, the regular user of the phone was the owner or possessor of the marijuana. We suppose the links in the chain to be sufficiently strong to circumstantially support the desired conclusion. In turn, we examine each of the text messages in that context.

The birthday greeting and response were not hearsay for that evidentiary purpose. The message was not being offered to prove the truth of the matter asserted—that the sender, indeed, wanted the user of the phone to have an enjoyable birthday or even that it was actually the user's birthday. But it does show the sender believed it to be the user's birthday. And the recipient's response does not contradict that belief. Otero's lawyer proffered that he would independently prove the message was sent on Garcia's birthday. In combination, those pieces of evidence would circumstantially suggest the smartphone could be Garcia's, thereby making the birthday text message and response at least minimally probative of the ultimate issue of whose marijuana was in the bag with the smartphone. But the text message wasn't material. The State and Otero agreed the smartphone belonged to Garcia, and the evidence on that point was undisputed. The prosecutor never argued or attempted to prove the smartphone actually belonged to Otero. Accordingly, the birthday text message wasn't relevant, and it was properly excluded as evidence for that reason.

The second text message consisted of an incoming offer to buy marijuana. The user of the smartphone did not respond to the sender's offer. As an offer—the first step toward formation of a contract—the text message represented a verbal act and, therefore, was not hearsay. (It doesn't matter that the proposed contract would have been illegal and, thus, unenforceable.) Otero's lawyer wanted to rely on the message to show that the regular user of the smartphone, which he would otherwise prove to be Garcia, trafficked in marijuana. But a single incoming text message was insufficiently probative of the fact to be proved to be relevant. The sender may have been relying on a bad lead in contacting that phone number to buy marijuana or may have directed the message to the wrong number. In the absence of some sort of affirmative response from the recipient or a series of incoming texts from different senders all offering to buy marijuana, the lone message doesn't tend to prove the regular user of the smartphone was a marijuana dealer. An isolated message of that sort, which effectively is what Otero's lawyer offered, would, if anything, tend to suggest the absence of drug trafficking, since one would expect a dealer's smartphone to reflect regular communications related to the illicit enterprise. Although the offer to buy wasn't hearsay, it wasn't relevant, either. So the district court's ultimate ruling barring the offer-to-buy text message reflected the right result.

Even if we are mistaken in considering relevance at all or in our conclusion that text messages were properly excluded as evidence, any error was harmless. In other words, had the text messages been admitted, the jury still would have convicted Otero. The wrongful exclusion of evidence does not entail a constitutional error, so the standard for harmlessness asks whether there was a reasonable probability the mistake affected the outcome of the trial. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011). The State bears the burden of showing the absence of that probability. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012). We comfortably conclude there was little or no probability the verdict would have been any different had the text messages been admitted. Assuming they were relevant, they carried only marginal evidentiary value.

13

For the reasons we have concluded the respective messages were not sufficiently probative or material to be admitted at all, they lacked enough weight to have had a significant impact on the jury's consideration of the other evidence. Most notably, of course, the jury heard about Otero's repeated out-of-court declarations that the marijuana belonged to him. The text messages were, at best, circumstantial and rather dim sidelights to that especially glaring evidence of Otero's guilt.

*Prosecutorial Error in Closing Argument*

During the trial, neither the State nor Otero offered forensic evidence taken from the cell phone, the tote bag, or the sandwich bags containing the marijuana to show who might have handled them. The jurors heard nothing about fingerprints on or DNA retrieved from those items. Otero contends the prosecutor improperly commented on forensic evidence during his closing argument to the jurors, thereby rendering the trial and the resulting verdict unfair.

To assess impropriety in a prosecutor's closing argument, the Kansas appellate courts now deploy the analytical model outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), that first considers "error" and then weighs any "prejudice" to the defendant resulting from an error. Comments made during argument will be considered error if they fall outside the wide latitude afforded a prosecutor in discussing the evidence and the law. 305 Kan. at 109. This simply transplants the initial step in the former analytical process. 305 Kan. at 104-05. If an appellate court finds the challenged argument to be prosecutorial error, it must then consider prejudice measured by the test set out in *Ward*, 292 Kan. 541, Syl. ¶ 6, for constitutional error. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must

14

determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. 305 Kan. at 98-99, 109. This prejudice analysis supplants a multifaceted test that had been used to assess reversible error. See *State v. Barber*, 302 Kan. 367, 378-79, 353 P.3d 1108 (2015) (setting forth the now discarded approach based on prosecutorial misconduct and reversible error).

In his closing argument, Otero's lawyer pointed out to jurors that the State did not check for or analyze any fingerprints or DNA. He then said, "[W]e can't prove to you, we can't show to you that it wouldn't be [Otero's] DNA, and that it wouldn't be [Otero's] fingerprints." The prosecutor lodged no objection to that argument. But in his rebuttal argument, the prosecutor referred to the absence of fingerprint and DNA evidence and told the jurors: "What is that [DNA or fingerprints are] going to show? Other than exactly what Mr. Otero said, 'It's mine.'" Otero submits the prosecutor's statement during rebuttal amounted to an improper argument and, thus, error.

We are inclined to agree, though with a cautionary explanation. Both lawyers seem to have suggested to the jurors what the results of nonexistent DNA testing and the analysis of never-recovered fingerprints would have shown. And in their respective forensic fantasy worlds, each lawyer implies a diametrically opposite conclusion. From our vantage point, both lawyers have made improper arguments to the jurors premised on "facts"—the hypothetical forensic evidence—that were never presented during trial. See *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011) (prosecutor commits error by arguing facts not in evidence); *Glynos v. Jagoda*, 249 Kan. 473, 480-81, 819 P.2d 1202 (1991) (plaintiff's lawyer engaged in improper jury argument by referring to factual circumstances outside the evidence).

In this case, the State cannot justify or excuse an improper rebuttal argument as simply a fair or invited response to Otero's equally improper argument on the same point. See *State v. Sprague*, 303 Kan. 418, 428-29, 362 P.3d 828 (2015) (improper defense

15

argument does not open door to prosecutor to respond with improper counterargument). A prosecutor's remedy lies in making a contemporaneous objection to an improper defense argument.

Having found error, we move to the second step of the *Sherman* test and ask whether that error deprived Otero of a fundamentally fair trial under all of the circumstances. As we have said, the State has the burden to show beyond a reasonable doubt that the verdict would have been the same absent the error. Here, we conclude the State has satisfied its obligation. Otero's multiple confessions to ownership of the marijuana stand as powerful evidence of his guilt—evidence that was untarnished by either lawyer's comments about nonexistent forensic testing. The prosecutor's rebuttal argument didn't bolster the case against Otero in a material way and certainly didn't sway the jury to convict in what otherwise could be characterized as a close case.

*Impediment to Jury Nullification*

Otero contends the jury instruction outlining the State's burden of proof and advising the jurors that "[i]f you have no reasonable doubt as to the truth of each of the claims required to be proved by State, you should find the defendant guilty," deprived him of a constitutionally fair trial and vitiates the guilty verdict. He says use of the word "should" imposes an impermissible directive on the jurors to convict and, therefore, improperly impedes jury nullification. We disagree.

This court considered and rejected this precise argument in *State v. Bradford*, No. 115,008, 2016 WL 7429318, at *3-4 (Kan. App. 2016) (unpublished opinion) (use of "should" in reasonable doubt instruction does not impinge on jury nullification or deprive defendant of fair trial). We find the analysis in *Bradford* persuasive and incorporate it here:

16

"Bradford premises his position on *State v. Smith-Parker*, 301 Kan. 132, 163-64, 340 P.3d 485 (2014), in which the court indicated that an instruction telling jurors they 'must' find the defendant guilty if a crime has been proved beyond a reasonable doubt impermissibly encroaches on the power of jury nullification. The court considered the jury instruction along with other trial irregularities and reversed Smith-Parker's convictions based on cumulative error. 301 Kan. at 168. The court, however, voiced no concern about Smith-Parker's proposed alternative instruction substituting 'should' for 'must,' thus matching the instruction used here. 301 Kan. at 163-64. As a result, *Smith-Parker* is, at best, oblique authority for Bradford's position.

"Looking at the issue more generally, the word 'should' conveys a conditional obligation rather than a categorical one. Merriam-Webster's Collegiate Dictionary 1082 (10th ed. 2001) ('should' defined as expressing 'obligation, propriety, or expediency,' sense 2; defined as expressing 'what is probable or expected,' sense 4). That is, if someone 'should' do something, they ought to but need not. By contrast, 'must' reflects 'compelled' action or conduct. Merriam-Webster's Collegiate Dictionary 766 (10th ed. 2001) (defining 'must'). In explaining a jury's duty, the word 'should' imports nothing amiss or improper. Jurors in a criminal case have a duty to bring back a guilty verdict if they are convinced beyond a reasonable doubt the defendant committed the charged crime. See *State v. Stinson*, No. 112,655, 2016 WL 3031216, at *3 (Kan. App. 2016) (unpublished opinion) (Atcheson, J., concurring); *State v. Cash*, No. 111,876, 2015 WL 5009649, at *4 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1079 (2016). Those jurors are typically sworn 'to try the case conscientiously and [to] return a verdict according to the law and the evidence,' as are civil jurors. K.S.A. 2015 Supp. 60-247(d); *Cash*, 2015 WL 5009649, at *4. Nevertheless, jurors in criminal cases have the unchecked power to acquit a defendant in complete disregard of the applicable legal principles, the evidence, or both, thereby allowing an obviously guilty person to walk free. A jury's exercise of its collective power of nullification necessarily shreds its duty to follow the law, to fairly find the facts, and to render a 'true' verdict.

"While permitting nullification in criminal cases, the judicial process deliberately offers virtually no acknowledgment of or accommodation to nullification. *Stinson*, 2016 WL 3031216, at *3 (Atcheson, J., concurring) ('One of the paradoxes of jury nullification lies in the silence that shrouds it.'). Lawyers may not speak of that power in the presence of the jurors, and district courts do not inform jurors about it. See *State v. McClanahan*, 212 Kan. 208, 215-16, 510 P.2d 153 (1973) (no jury instruction should be given on

17

nullification); *State v. Chambers*, No. 111,390 2015 WL 967595, at \*8-9 (Kan. App. 2015) (unpublished opinion), *rev. denied* September 14, 2015 (district court properly precluded defense counsel from arguing for jury nullification). The use of the word 'should' in the jury instruction on reasonable doubt conforms to those rules. The instruction the district court gave affords ample allowance for jury nullification—an unbridled authority that is itself antithetical to the objectives of the judicial process."

Other panels of this court, both before and after *Bradford*, have similarly rejected the argument and have held the use of "should" in the reasonable doubt instruction to be legally appropriate. See, e.g., *State v. McDuffie*, No. 113,987, 2017 WL 2617648, at \*8-9 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* June 28, 2017; *State v. Spalding*, No. 114,561, 2017 WL 1433513, at \*8 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* May 18, 2017; *State v. Bostic*, No. 115,114, 2017 WL 1382603, at \*5-6 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* May 12, 2017; *State v. Campbell*, No. 114,167, 2016 WL 3407598, at \*3-4 (Kan. App. 2016) (unpublished opinion) (collecting cases), *rev. denied* 306 Kan. ___ (April 26, 2017); *State v. Hastings*, No. 112,222, 2016 WL 852857, at \*4-5 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. ___ (April 17, 2017) ; *State v. Jones*, No. 111,386, 2015 WL 4716235, at \*5-6 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1080 (2016). We join them and find no error.[2]

[2]Otero has also argued that even if the errors leading up to and occurring during his trial did not individually warrant relief, their cumulative impact undermined the jury's verdict. See *Smith-Parker*, 301 Kan. at 167-68 (appellate courts may consider cumulative impact of trial errors that individually might be harmless). We have identified only one possible error—the prosecutor's comment in closing argument. So there is nothing to aggregate. Cumulative error, therefore, does not come into play and cannot be a basis for relief in this case. *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010).

*Sentencing Enhancement Based on Past Conviction*

The State charged Otero with felony possession of marijuana based on his 2006 conviction for a like crime in Florida. See K.S.A. 2016 Supp. 21-5706(c)(2)(B). As a recidivist, Otero faced a drug severity level 5 felony rather than a class A misdemeanor. On appeal, Otero contends the State failed to prove he had the assistance of a lawyer when he pleaded no contest to the Florida charge of misdemeanor possession of marijuana. See *State v. Youngblood*, 288 Kan. 659, Syl. ¶ 3, 206 P.3d 518 (2009) ("An uncounseled misdemeanor conviction obtained in violation of the misdemeanant's Sixth Amendment right to counsel may not be collaterally used for sentence enhancement in a subsequent criminal proceeding.").

The State presented a certified order from the Florida circuit court showing Otero was represented by a public defender when he entered his plea in 2006. The document specifically indicated Otero appeared for plea and sentencing with a lawyer and generically identified the lawyer as the "Provisional Public Defender." In this case, Otero offered no contradictory evidence to the district court. The district court found Otero to have been represented by a lawyer in the Florida case and found the certified order sufficient to prove a previous conviction triggering the recidivist enhancement in K.S.A. 2016 Supp. 21-5706.

In reviewing this point, we ask simply whether substantial evidence supported the district court's findings. *State v. Hughes*, 290 Kan. 159, 162, 224 P.3d 1149 (2010). The unrebutted certified order satisfies that comparatively relaxed standard. The district court, therefore, ruled correctly, and Otero was properly prosecuted for and convicted of felony possession of marijuana.

Affirmed.