NOT DESIGNATED FOR PUBLICATION

No. 126,403

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WILLIE JEROME SMITH-PARKER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Saline District Court; JAMES R. FLEETWOOD, judge. Submitted without oral argument. Opinion filed May 17, 2024. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., MALONE and WARNER, JJ.

PER CURIAM: Willie Jerome Smith-Parker, who is serving a 796-month prison sentence for second-degree intentional murder, theft, second-degree reckless murder, and aggravated assault, appeals the summary denial of his K.S.A. 60-1507 motion alleging that he received ineffective assistance of counsel. Smith-Parker's only claim on appeal is that the district court erred by not granting an evidentiary hearing on his motion. As explained below, we agree with the district court that Smith-Parker's motion included only conclusory allegations that would not have affected the outcome of his trial. Because the motion, files, and records of the case conclusively show that Smith-Parker is entitled to no relief, the district court did not err in summarily denying the motion.

1

In 2009, the State charged Smith-Parker with first-degree premeditated murder, theft, and two counts of aggravated burglary in one case and in a separate case charged him with second-degree intentional murder and aggravated assault. The cases were consolidated, and Smith-Parker was eventually convicted of every charge except the aggravated burglaries. Smith-Parker appealed, and the Kansas Supreme Court reversed his convictions and remanded for a new trial based on cumulative error. *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 (2014) (*Smith-Parker I*).

On remand, after hearing the testimony and the other evidence more fully described in *State v. Smith-Parker*, No. 114,713, 2017 WL 5014898, at *1-8 (Kan. App. 2017) (unpublished opinion) (*Smith-Parker II*), the jury convicted Smith-Parker of the lesser included offense of second-degree intentional murder, theft, the lesser included offense of second-degree reckless murder, and aggravated assault. For these offenses, the district court sentenced Smith-Parker to 796 months' imprisonment.

The *Smith-Parker II* panel laid out the facts underlying his convictions as follows:

"On Saturday, June 13, 2009, around 5:20 a.m., police were called to investigate a potential aggravated burglary at the Johnstown apartment complex located in Salina, Kansas. Benjamin Friedman had called police because his and his roommate's 52" flat screen Samsung television set, PlayStation 3, videogames, and DVDs were missing from their apartment in building 1012. Friedman had told police that around 4:45 a.m., when his alarm clock went off, he had heard a loud commotion. Friedman said it sounded like 'someone rushing down the stairs,' then 'a car backfiring,' and then the 'squealing of tires.' Friedman explained that when he got out of bed, he noticed that the electronics were missing and the back sliding door of their apartment was open.

"Officer Glen Soldan responded to Friedman's 911 call. While investigating, he attempted to contact the other tenants living in building 1012. Yet, when Officer Soldan

approached the front door of the downstairs apartment, he immediately noticed that the front door had been damaged. When Officer Soldan knocked on the door, the door opened slightly. Through this slight opening, Officer Soldan could see a man covered in blood lying on the floor. Officer Soldan entered the apartment to help the man, but it was clear that the man was already deceased. The deceased man was eventually identified as Alfred Mack, the tenant of that apartment.

"Six days later, on Friday, June 19, 2009, at 6:23 a.m., a nurse at the Salina Regional Health Center (SRHC) called 911 because the man who had just been driven to the emergency room was suffering from a single gunshot wound to the head. Justin Letourneau was the man suffering from the gunshot wound, and Smith-Parker was the man who had driven him to the SRHC. Letourneau was unresponsive and his breathing was irregular.

"Officer Crystal Hornseth responded to the 911 call. Upon arrival, Officer Hornseth asked Smith-Parker how Letourneau was injured. Smith-Parker told her that '[he] killed [Letourneau]' while '[o]n the road' because Letourneau was 'beating his "baby's momma." Smith-Parker immediately clarified this statement, stating: 'Well, he didn't even beat her. He told me he was going to kill me.' The mother of Letourneau's children and on-again off-again girlfriend was Kendra Yanik-Ducharme. Based upon these statements, Smith-Parker was placed under arrest.

"Police then immediately started looking for Yanik-Ducharme. Police quickly found Yanik-Ducharme at her Salina apartment and requested that she come down to the station for questioning. Yanik-Ducharme complied.

"During that interview, which occurred mid-morning on June 19, 2009, Yanik-Ducharme explained that Smith-Parker and Letourneau had been fighting in front of her apartment around 4 a.m. that morning. Yanik-Ducharme explained that the argument between Smith-Parker and Letourneau eventually moved from her apartment to the house of Smith-Parker's on-again off-again girlfriend, Tiffany Wellman, around 6 a.m. Once at Wellman's house, Smith-Parker and Letourneau got into a car belonging to Wellman, and Smith-Parker drove off with Letourneau in the car. Yanik-Ducharme told police that she

3

did not see either Smith-Parker or Letourneau after this point. Yanik-Ducharme also mentioned to police that Smith-Parker had 'killed the guy on Johnstown.'

"The next day, June 20, 2009, Letourneau died as a result of the gunshot wound to his head.

"During the ensuing investigation, the police uncovered additional information tending to incriminate Smith-Parker in the death of Mack. This information included the following: (1) that a cartridge casing found just inside Mack's apartment door and a cartridge casing found inside Wellman's car—the car Letourneau was shot in—were discharged from the same gun; (2) that Travis Graham, Letourneau's stepbrother, confessed that he, Letourneau, Smith-Parker, and a man named Thomas Jenkins had burglarized the 'upstairs apartment' before going to 'Alfred Mack's [apartment].'" *Smith-Parker II*, 2017 WL 5014898, at *1-2.

The *Smith-Parker II* panel also summarized the events of the second jury trial:

"Smith-Parker's second jury trial was held between April 27, 2015, and May 12, 2015. Over the course of the trial, the State had over 75 people testify on its behalf. The State's theory against Smith-Parker in the 09 CR 1047 case was that Smith-Parker aided and abetted in the murder of Mack and theft of Friedman and Johnson's electronics. Although the State argued that Smith-Parker could very well have been the person who had shot Mack, the State emphasized that the jury could find Smith-Parker guilty as long as it believed he aided and abetted his accomplices—Jenkins, Letourneau, and Graham—in the completion of the murder. The State's theory against Smith-Parker in 09 CR 633 was that Smith-Parker became angry with Letourneau, intentionally killing him during their argument. The State alleged that Smith-Parker shot Letourneau while Letourneau sat in the front passenger seat of Wellman's car, when the car was still parked in front of Wellman's house.

"Concerning Mack's death and the theft, Donyell Smith and Nathan Johnson (Nathan) placed Jenkins at the Johnstown apartment complex in the early morning hours of June 13, 2009. Smith and Nathan lived in another apartment of building 1012; their

4

apartment was directly across from Mack's apartment and directly below Friedman and Johnson's apartment. Both Smith and Nathan were friends with Jenkins. Smith testified that she was drinking on their porch sometime after midnight in the very early hours of June 13, 2009, when she saw Jenkins across the way with a black man and a white man. Of significance, although Smith could not provide any additional description regarding the men accompanying Jenkins, Smith-Parker is black, Letourneau was white, and Letourneau's stepbrother Graham is white. Smith testified that she spoke to Jenkins for some time before Jenkins walked away. Nathan testified that he saw Jenkins later that morning around 2 or 3 a.m., at which point they discussed the fact that Friedman and Johnson had left their sliding glass door partly open.

"Yanik-Ducharme testified that she remembered Smith-Parker and Letourneau waking her up very early in the morning on June 13, 2009; she testified that it was early enough that it was still dark out. She testified that they had brought in a large flat screen television into her apartment. She testified that the television's brand started with an 'S,' possibly a Samsung or Sony television. She stated that the television disappeared from her apartment a few days later; she was under the impression that Smith-Parker and Letourneau were taking it to Wichita.

"Wellman testified that early one Saturday morning in June 2009 she was awakened by people talking in her living room. At trial, she testified that she could not recall specific details about who these people were. Yet, the State admitted into evidence Wellman's June 20, 2009, police interview where Wellman told police that it was Smith-Parker, Letourneau, and 'a white guy' she did not know who had awakened her. Wellman also told police that shortly after that morning either Smith-Parker or Letourneau gave her and Smith-Parker's 7-year-old son a PlayStation 3 as a gift. The PlayStation 3 was wrapped up in a blanket and had cords sticking out of it. In her police interview, Wellman explained that many videogames and DVDs had also started showing up in her house between June 13, 2009, and June 19, 2009.

"Kendra Jenkins (Kendra), Thomas Jenkins' wife, testified that sometime around 2 a.m. on June 13, 2009, she came home to find her husband, Smith-Parker, Letourneau, and a white man she only knew as Letourneau's brother at her house. Kendra testified that she decided to leave with a friend, but when she returned home at 7 a.m., all four men

were still at her house. She testified that she overheard a conversation about a large flat screen television before she went to bed. Kendra further testified that a few days after this incident, Jenkins made her drive him to the country to burn a pair of 'Servus' brand rubber boots. With Kendra's cooperation, police were able to recover the burned remnants of a Servus brand boot sole; this boot was admitted into evidence.

"Various law enforcement officers testified about the physical evidence recovered in connection to Mack's death as well as the circumstances surrounding Mack's death. Investigator Ron Styles testified that it appeared that Mack's door had been kicked in. Investigator Styles explained how there was a footprint on the center-exterior portion of Mack's door, which he was able to use technology to 'lift.' The footprint was left by a Servus brand boot. Investigator Styles also testified about finding a Winchester Super X .22 cartridge casing just inside Mack's apartment door. Another police officer testified about finding an empty gun case, nine Winchester Super X .22 bullets, a box of .38 special ammunition, a PlayStation 3, and numerous videogames and DVDs at Wellman's house. This officer also testified that the serial number on the PlayStation 3 and the titles of the videogames and DVDs recovered from Wellman's house matched those stolen from Friedman and Johnson's apartment.

"To get the phone records of Smith-Parker, Letourneau, Jenkins, Graham, and Wellman admitted into evidence, the records custodians of their respective cell phone providers were called as expert witnesses by the State. The phone records established that Smith-Parker, Letourneau, Jenkins, and Graham had been calling each other on their respective cell phones in the early morning hours of June 13, 2009, before the crimes occurred at the Johnstown apartment complex. Smith-Parker also placed 11 phone calls to Jenkins between 10:18 p.m., June 18, 2009, and 5:42 a.m., June 19, 2009. Michael Rogers, an investigator with the Saline County Attorney's Office, testified about cell phone records mapping. This is when a cell phone user's general geographical location can be determined by the user's cell phone records and the cell towers that the user's calls connected with. Over Smith-Parker's objection, maps Rogers created based on calls Smith-Parker placed on June 13, 2009, and June 19, 2009, were admitted into evidence.

"Holly Latham, a KBI blood splatter expert, testified that there was blood all over Mack's apartment, indicating that Mack moved around before finally collapsing and

6

dying on his kitchen floor. Dr. Altaf Hossain, the coroner who performed Mack's autopsy, testified that Mack was shot in the chest, with the bullet piercing his left lung and pericardial sac at a range of 2 to 3 feet. He testified that Mack's death resulted from this injury and was a homicide. Dr. Hossain testified that it could have taken anywhere from one to five minutes for Mack to die from this gunshot wound.

"In addition to the preceding evidence, the State admitted letters Smith-Parker had written while in jail. The first letter was from Smith-Parker to Wellman, and he asked Wellman to check her work schedule because he was confident that he had spent the morning of June 13, 2009, with her at her home. His second letter was to his and Wellman's 7-year-old son. In this letter, he placed blame on Wellman: 'Your mom don't remember me being at the house, but I had you with me from the time we woke up, went over to Justin's, and brought everybody back to the park by the house.' His third letter was to a person named 'TJ.' In this letter, Smith-Parker wrote: '[Wellman] could of ended one of these cases, but all of a sudden she had a memory lapse. Man that bitch ain't shit.'

"Concerning Letourneau's death, Yanik-Ducharme testified about the argument that occurred between Smith-Parker and Letourneau in the early morning hours of June 19, 2009. Evidently, Yanik-Ducharme and Letourneau had been fighting for some time. They had both gone to an event at a local bar on June 18, 2009, but had gone with different groups of friends. When Yanik-Ducharme arrived home around 4 a.m., Smith-Parker and Letourneau were sitting in Wellman's car waiting for her. Letourneau, who did not have keys to Yanik-Ducharme's apartment, confronted Yanik-Ducharme when she returned on her front porch of her apartment. He eventually hit her across the face. Yanik-Ducharme testified that she then went to Smith-Parker for help. She stated that after Smith-Parker and Letourneau yelled at one another for a while, Smith-Parker got into Wellman's car and then sped off.

"Yanik-Ducharme testified that when Smith-Parker returned several minutes later, he had a large silver semi-automatic gun in his hand. Two neighbors of Yanik-Ducharme also testified that Smith-Parker was holding a gun while arguing with Letourneau. One of those neighbors testified that Smith-Parker was yelling that he was going to kill Letourneau. Yanik-Ducharme explained that Smith-Parker eventually left

7

her apartment, but Letourneau told her to drive him over to Wellman's house, where they presumed Smith-Parker would be.

"Yanik-Ducharme drove to Wellman's house, arriving there around 6 a.m. Yanik-Ducharme testified that once at Wellman's house, Letourneau got out of her car and knocked on Wellman's door. Although Yanik-Ducharme remained in her car, Yanik-Ducharme testified that she could see Smith-Parker open the door, walk outside, and continue the argument with Letourneau. She explained that during the argument, Smith-Parker threw his gun, which was the same gun he had at her apartment, down on the ground. She testified that shortly thereafter, Smith-Parker got into the driver's side seat of Wellman's car and Letourneau got into the passenger seat of Wellman's car, and they drove off together.

"Sheree Osland, a nurse at SRHC, testified that as soon as Smith-Parker arrived with Letourneau, she called 911; her emergency call was placed at 6:23 a.m. Osland testified that Smith-Parker had told her that Letourneau had attempted to commit suicide. Officer Hornseth, who was the first police officer to respond to Osland's call, testified that she turned on her pocket recorder before speaking to Smith-Parker. Her pocket recorder captured Smith-Parker's comment that he had 'killed [Letourneau]' while '[o]n the road' because Letourneau was 'beating his "baby's momma,"' which was immediately followed by the statement: 'Well, he didn't even beat her. He told me he was going to kill me.'

"Besides this recorded statement, a telephone conversation Smith-Parker had with Kathy Trato, Letourneau's mother, was admitted into evidence. In this telephone conversation, Smith-Parker told Trato that Letourneau was not suicidal but accidently shot himself while messing around with the gun. When Trato asked Smith-Parker where the gun was, he told her he had thrown it in the river while driving Letourneau to the hospital because it was 'involved' in 'something else.'

"Dr. Ronald Distefano, the coroner who performed Letourneau's autopsy, explained that based upon the stippling on Letourneau's forehead, he was certain that the gun was not touching Letourneau's skin when he was shot. Instead, he estimated that the gun was about a few inches away from Letourneau's forehead. Dr. Distefano explained

8

that the bullet entered near Letourneau's right temple, moving left to right and at a slightly downward and front to back angle. Dr. Distefano testified that he believed that Letourneau's death was not an accident or a suicide, but a homicide.

"A significant part of both the State's cases against Smith-Parker was the ballistics evidence. In addition to the .22 millimeter cartridge casing found just inside Mack's apartment door, the police found a .22 millimeter cartridge casing under the driver's seat of Wellman's car. The cartridge casings, as well as the bullets removed from Mack's and Letourneau's bodies, were sent to Zachary Carr, a KBI gun specialist. Carr testified that despite being heavily damaged, he could tell that the bullets retrieved from Mack's and Letourneau's bodies were both .22 millimeter bullets. Carr testified that the cartridge casings belonged to Winchester Super X .22 millimeter bullets. He then concluded that the cartridge casing found just inside Mack's apartment door was discharged by the same gun as well as the cartridge casing found under the driver's seat of Wellman's car. He testified he reached this conclusion because the cartridge casings had identical linear markings, firing pin impressions, and extractor mark impressions under 30x and 60x magnification.

"For his 09 CR 1047 case, Smith-Parker's defense was that he did not murder Mack and he did not steal Friedman and Johnson's electronics. Smith-Parker's arguments emphasized that there was no direct evidence tying him to these crimes. He stressed that although Jenkins and Letourneau may have been guilty of committing the murder and theft, he was not. He also insinuated that he was at Wellman's house when Mack was murdered and Friedman and Johnson's electronics were stolen.

"For his 09 CR 633 case, Smith-Parker argued that he never threatened Letourneau and he never meant to hurt Letourneau. The only evidence Smith-Parker presented in his own behalf came in the form of his own testimony. But Smith-Parker's testimony was of a limited nature.

"Smith-Parker's description of how the argument between him and Letourneau started and ultimately reached Wellman's house differed little from Yanik-Ducharme's testimony. He did assert, however, that he never brandished the gun or in any way threatened Letourneau during their argument.

9

"Regarding what happened once at Wellman's house, Smith-Parker testified that when Letourneau knocked on Wellman's front door, Smith-Parker walked out to the front lawn where he threw his gun on the ground. Smith-Parker then explained what happened next: 'Yeah. I'm talking to him out there. I'm talking to him. We at the grass, we talking. And so I can't say what he said, but I was, like, I don't need a gun, you know. So then I told him to take his gun.' Although unclear, somewhere in this exchange Smith-Parker and Letourneau must have decided to take a drive in Wellman's car because Smith-Parker testified that he then went inside to get Wellman's car keys. He explained that after getting the car keys, he decided to retrieve the gun he had thrown on the ground because he did not want his son to pick it up.

"Smith-Parker testified that once in Wellman's car, he placed the gun near the car's gear shift and Letourneau began giving him driving directions. He testified that Letourneau had him drive to a place out in the country where they used to practice shooting. He testified that he decided to sit on the hood of the car while Letourneau remained in the passenger seat of the car. Smith-Parker testified that it was at this point that Letourneau picked up the gun and started playing with it by pointing it at his head and 'talking stupid.' He testified that he told Letourneau to stop while attempting to yank the gun out of Letourneau's hand. Smith-Parker asserted that this is when the gun accidently went off, resulting in a gunshot wound to Letourneau's head. Smith-Parker testified that he then got into the car and started driving to the hospital. He asserted that he was able to toss the gun into a river while crossing a bridge on the way to the hospital without ever stopping.

"During cross-examination, Smith-Parker testified that at one point during his argument with Letourneau, Yanik-Ducharme grabbed at him even though he was holding the gun. He testified that he responded by pushing Yanik-Ducharme out of the way because he knew the gun had a 'hair trigger.' When confronted by the prosecutor why he would try to yank the gun away from Letourneau's hand if he knew the gun had a 'hair trigger,' Smith-Parker said: 'Dude, it was stupid. I admit that. But it—but I just did it, man, just trying to take that gun away from his head, man. I told him to quit playing with it.'

10

"At the close of the case, the jury was instructed that it could find Smith-Parker guilty of the murder of Mack if it believed he aided or abetted in the commission of the offense. In addition to the first-degree murder instruction involving Mack's homicide, the jury was also instructed on the possibility of convicting Smith-Parker of second-degree intentional murder as a lesser included offense. Moreover, in addition to the second-degree intentional murder instruction concerning Letourneau's homicide, the jury was also instructed on second-degree reckless murder and involuntary manslaughter as lesser included offenses. In the end, the jury found Smith-Parker guilty of the second-degree intentional murder of Mack, the theft of Friedman and Johnson's electronics, the second-degree reckless murder of Letourneau, and the aggravated assault of Letourneau." *Smith-Parker II*, 2017 WL 5014898, at *4-8.

After he was convicted on remand, Smith-Parker appealed again, this time arguing (1) his cases should not have been consolidated; (2) the district court erred by allowing nonexpert testimony about cellphone record mapping; (3) the court gave an erroneous limiting instruction; (4) cumulative error; and (5) the court erred at sentencing by using his criminal history to enhance his sentence without submitting it to a jury. After reviewing each of Smith-Parker's claims, this court affirmed his convictions and sentence. 2017 WL 5014898, at *1. Although the Kansas Supreme Court initially granted Smith-Parker's petition for review, it later found that the review was improvidently granted. The mandate was issued on February 5, 2020.

Smith-Parker filed a timely K.S.A. 60-1507 motion on October 5, 2020. In his motion (and the supplement and amendment he later filed), Smith-Parker argued that he received ineffective assistance from his trial and appellate counsel. The motion included many alleged errors and oversights, including: (1) His trial counsel, Julie Effenbeck failed to call a number of fact-witnesses to support his desired defense that he was not involved in Mack's death; (2) Effenbeck failed to challenge the legality of a police search; (3) Effenbeck failed to call an expert on gun powder residue; (4) Effenbeck failed to raise a double jeopardy challenge; (5) Effenbeck failed to subpoena a doctor to testify about

11

Letourneau's drug usage; (6) Effenbeck failed to procure an expert on cellphone tower mapping; (7) Effenbeck may have had a conflict of interest; (8) Effenbeck did not sufficiently investigate his desired defense of actual innocence; and (9) his appellate counsel, Christina Kerls, failed to raise certain issues on appeal.

The district court appointed counsel to represent Smith-Parker, and the State filed a 12-page response to the K.S.A. 60-1507 motion addressing the claims. After reviewing the pleadings and the records of the case, the district court filed a journal entry adopting the State's response and dismissing Smith-Parker's motion. The district court found:

> "The petitioner relies on misstatements of fact, misapplication of case law, hearsay and conclusory statements to support his contentions. The petitioner has failed to present any argument that would show that either counsel's actions was deficient in a manner that deprived him of a fair trial or that there is any reasonable probability that the outcome of the trial would have been different."

Smith-Parker timely appealed the denial of his motion. The district court appointed counsel to represent Smith-Parker on appeal.

## DID THE DISTRICT COURT ERR IN SUMMARILY DENYING SMITH-PARKER'S K.S.A. 60-1507 MOTION?

Smith-Parker's only claim on appeal is that the district court erred by not granting an evidentiary hearing on his motion. The State contends that the district court's summary denial of Smith-Parker's K.S.A. 60-1507 motion was proper.

A district court has three options when presented with a movant's K.S.A. 60-1507 motion:

12

"'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018).

When, as here, the district court exercises the first option, and summarily denies the motion, this court conducts de novo review to determine whether the motions, files, and records of the case conclusively show the movant is entitled to no relief. See, e.g., *Beauclair v. State*, 308 Kan. 284, 293, 419 P.3d 1180 (2018). To warrant an evidentiary hearing, a K.S.A. 60-1507 movant "'"must make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear in the record."'" *Noyce v. State*, 310 Kan. 394, 398, 447 P.3d 355 (2019).

Smith-Parker's motion raised claims of ineffective assistance of counsel. To establish ineffective assistance of trial counsel, a movant must show: (1) Counsel's performance was deficient under the totality of the circumstances; and (2) the defendant suffered prejudice because of that performance. *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]). The *Strickland* test also applies to claims of ineffective assistance of appellate counsel. See *Khalil-Alsalaami v. State*, 313 Kan. 472, 526, 486 P.3d 1216 (2021). Under the first prong, a defendant must establish deficient performance by showing that defense counsel's representation fell below an objective standard of reasonableness—this court's scrutiny of counsel's performance is highly deferential. 313 Kan. at 485-86. Under the second prong, the defendant must establish prejudice by showing "with reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence." 313 Kan. at 486.

Smith-Parker's motion raised many claims that he received ineffective assistance from his trial and appellate counsel. But on appeal, he argues only that an evidentiary hearing was required on his claim that his trial counsel, Effenbeck, was ineffective for failing to call certain fact witnesses to support his theory of defense that someone else was responsible Mack's murder. Smith-Parker maintains that if the potential testimony of these witnesses had been presented to the jury, there is a real possibility that he would not have been found guilty of murdering Mack. Issues not briefed are considered waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

Kansas courts have held that the decision whether to call a particular witness is a matter of trial strategy left to counsel. Strategic choices based on a thorough investigation of the law and facts are virtually unchallengeable. *Flynn v. State*, 281 Kan. 1154, 1157, 136 P.3d 909 (2006). That said, if counsel lacks "the information to make an informed decision due to inadequacies of his or her investigation, any argument of 'trial strategy' is inappropriate." *Mullins v. State*, 30 Kan. App. 2d 711, 716-17, 46 P.3d 1222 (2002).

Before addressing Smith-Parker's arguments on appeal, we pause to summarize the substantial evidence the State presented at trial supporting Smith-Parker's involvement in the Mack homicide. Multiple witnesses placed Smith-Parker at the scene of Mack's homicide and testified that Smith-Parker was involved in the apartment burglaries and theft where Mack was shot. The State prosecuted Smith-Parker under an aiding and abetting theory for the Mack homicide. Along with the witness testimony, the State presented ballistics evidence establishing that the same weapon used to kill Letourneau was used in the Mack homicide. Smith-Parker admitted to police that he shot Letourneau while the two men were inside Wellman's car, but he testified the shooting was an accident while he was trying to yank the gun from Letourneau's hand. This court summarized the ballistics evidence in *Smith-Parker II*, noting the bullets removed from Mack and Letourneau's bodies were both .22 caliber bullets and that the cartridges found

at both scenes had identical linear markings, firing pin impressions and extractor impressions—that is, they were fired from the same weapon. 2017 WL 5014898, at *7.

Smith-Parker's claims on appeal about Effenbeck's failure to call certain witnesses fall into three categories. First, Smith-Parker claims that Effenbeck was ineffective for failing to call four witnesses—Kendra Jenkins, Jackie Diamond, Investigator Watkins, and Sandra Akin—who would have cast blame on a person named William Gardenhire for the Mack homicide. Smith-Parker's appellate brief summarizes these witnesses' proposed testimony, quoting from the affidavit Smith-Parker filed in district court:

> "Kendra Jenkins would have testified that on the day of Mack's murder, Gardenhire was bragging about how much of a gangst[er] he was, and how he just escaped an attempted murder charge, and how he was better than everyone else because he sold ice for a living.
>
> "Jackie Diamond would have testified that Gardenhire was bragging about beating an attempted murder at the bar and hooking back up with him later that morning.
>
> "Investigator Watkins would have testified about Gardenhire's involvement in a previous shooting involving Mack and the possibility that the same person was involved in Mack's murder.
>
> "Sandra Akin would have testified that on the morning of Mack's murder, she heard three pops in rapid succession, which she believed to be gunshots, then saw a dark-colored SUV take off at a high rate of speed; Jackie Diamond drives a dark-colored SUV and was with Gardenhire during the early morning hours that day."

We agree with the district court's assessment that much of the proffered testimony would appear to be inadmissible hearsay. But even if the testimony were admissible, it is unclear how Gardenhire bragging about trying to shoot Mack on a prior occasion would have exonerated Smith-Parker of his involvement in the shooting on June 13, 2009, that resulted in Mack's death. It is just as unclear how Gardenhire's history with Mack or his

statements about him would overshadow Smith-Parker's connection to the murder weapon responsible for the death of both Mack and Letourneau, and Smith-Parker supplies no other facts that would tie Gardenhire to the gun.

Second, Smith-Parker claims that Effenbeck was ineffective for failing to call three witnesses—Craig Darby, Lawrence Zugg, and Kendra Jenkins—who allegedly would have testified that Kendra's brother, Thomas Jenkins, was the person who shot Mack. Again, quoting from the affidavit Smith-Parker filed in district court, the witnesses allegedly would have testified:

> "Consistent with his testimony during the preliminary hearing, Craig Darby would have testified that he and Jenkins were at Brian Lawrence's home when Jenkins saw a picture of Mack and said he had to put a bullet in him, as well as that Jenkins was preparing to perform a song in which he bragged about killing Mack.

> "Lawrence Zugg would have testified regarding Jenkins' admission that he killed Mack.

> "Consistent with her interview by Investigator Short, Kendra Jenkins would have testified that [Thomas] Jenkins said that he killed Mack, as well as that one of Jenkins' song lyrics talked about Mack's murder."

But even if this testimony was true, it would not have impacted the outcome of the trial considering the State's theory of the case was that Smith-Parker was guilty in the Mack homicide as an aider and abettor, and Thomas Jenkins was one of his accomplices in the crime. As the State points out: "Evidence solidifying that [Thomas] Jenkins murdered Mack would only have helped the State's case." As such, Effenbeck was not ineffective for failing to present this testimony to the jury.

Third, Smith-Parker claims that Effenbeck was ineffective for failing to call Tiffany Wellman who allegedly would have testified "that Smith-Parker brought home a

16

TV smaller than the one taken in a burglary of which Smith-Parker was acquitted." The television was never recovered in the investigation. It is unclear how this evidence would have affected the State's case that Smith-Parker participated in the murder of Mack. And just because Wellman may have been wrong on the size of the television would not be enough to cast doubt on Smith-Parker's involvement in the Mack homicide, given all the other evidence pointing to Smith-Parker's guilt including the ballistics evidence.

In sum, Smith-Parker's motion included only conclusory allegations that would not have affected the outcome of his trial. The testimony he claims Effenbeck should have presented, even if admissible, either would have had limited probative value or would have harmed his case. Even if Effenbeck's performance were somehow deficient on the points raised, there is no reasonable probability that the deficient performance affected the outcome of the proceedings, based on the totality of the evidence. Because the motion, files, and records of the case conclusively show that Smith-Parker is entitled to no relief, the district court did not err in summarily denying his motion.

Affirmed.